## ZUNIGA v. EVANS et al.

No. 5459. Decided August 13, 1935. (48 P. [2d] 513.)
Rehearing denied November 23, 1935.

200

202

*C. E. Norton, L. J. Bradford,* and *E. D. Hatch,* all of Salt Lake City, for appellants.

*Homer Holmgren* and *R. O. Pearce,* both of Salt Lake City, for respondent.

WOOLLEY, District Judge.

This is a suit to set aside a conveyance of real property made by the defendant Ernest I. Evans, as grantor, to the de-

fendants Eloise Evans (now Tanner) and Margaret Evans Snarr, his daughters, as grantees, and to subject the property to sale upon a judgment which plaintiff had obtained in another action against Ernest I. Evans. The plaintiff alleges that the conveyance was made without consideration and to hinder, delay, and defraud the creditors of the grantor and particularly the plaintiff. The defendants filed separate answers, in which they deny plaintiff's allegations of want of consideration and of fraud and affirmatively allege that the grantees paid a full, fair, and adequate consideration for the property. Defendant Ernest I. Evans, by an amendment to his answer, also affirmatively alleges that at the time of the conveyance the property was his homestead, and therefore he claims it is not subject in any event to sale upon plaintiff's judgment.

The case was tried twice, the first trial resulting in a judgment of nonsuit and dismissal of the action. A motion for a new trial was made by the plaintiff and granted by the court. The second trial resulted in a judgment in favor of the plaintiff according to the prayer of the complaint and the defendants appeal. Based upon sixty-five assignments of error, which are deemed sufficient for the purpose, the appellants argue: (1) That the court erred in granting a new trial; (2) that the complaint does not state facts sufficient to constitute a cause of action; (3) that the evidence shows that the grantees in the deed paid a full fair, and adequate consideration for property, and hence that the findings to the contrary and the conclusions of law and judgment based thereon are erroneous; and (4) that the property conveyed was exempt to Ernest I. Evans under the homestead laws of this state, and therefore beyond reach of his creditors, so that in any event respondent has no right to complain. These points will be disposed of in the order in which they are stated.

1. The motion for a new trial was based upon the grounds: (a) Insufficiency of the evidence to support or justify the judgment of nonsuit and dismissal; (b) that the judgment

is against law; and (c) errors in law occurring at the trial and excepted to by the plaintiff. The case was dismissed at the close of plaintiff's case in chief because the trial court was of the opinion she had not made out a prima facie case; and the motion for a new trial was granted, it seems, because the trial judge upon further consideration decided he had been in error in dismissing the complaint. When the plaintiff rested her case, there was evidence before the court from which it might well have been inferred that Evans was insolvent when he executed the conveyance to his daughters, or that he was thereby rendered insolvent; the deed had been put in evidence in which a consideration of $10 and other good and valuable consideration is recited, but there was no evidence to show anything else about the consideration, while there was evidence to show that the property was of a fair value of $3,250; it was alleged in the complaint and admitted by the answer of defendant Ernest I. Evans that the conveyance was made after the date of the accident and but a few days before the trial of the action for damages; and it was alleged in the complaint and admitted by all the answers that the grantees were daughters of the grantor. If the complaint states a cause of action, which we assume for the present it does, then it was necessary for defendants to go forward with their proof to show, as they alleged, that the daughters paid their father a fair consideration for the property, or suffer judgment to go in favor of the plaintiff. See *Paxton* v. *Paxton*, 80 Utah 540, 15 P. (2d) 1051. The recited consideration of $10 is not a fair consideration, and the expression "other good and valuable considerations" means nothing until explained by extrinsic evidence. So we conclude the court was wrong in granting the motion for a nonsuit and in dismissing the complaint, and right in granting the motion for a new trial.

2. As to the complaint: The suit is brought under the Uniform Fraudulent Conveyances Act, chapter 42, Laws Utah 1925. In the first six paragraphs of her complaint,

plaintiff alleges: That on November 26, 1930, judgment was rendered in her favor and against defendant Ernest I. Evans in the district court of Salt Lake county, Utah, for $3,225 damages and $38.20 costs, in an action to recover damages for personal injuries sustained by plaintiff through the negligence of said defendant in an automobile accident which occurred on December 31, 1929; that execution had been issued on said judgment and returned wholly unsatisfied; that after plaintiff had commenced her said action for damages, Evans conveyed his property, which is described, to the other two defendants in this suit; that the other two defendants are daughters of Ernest I. Evans; that Ernest I. Evans conveyed said property to his daughters without any consideration and for the purpose of hindering, delaying, and defrauding his creditors, and particularly for the purpose of hindering, delaying, and defrauding plaintiff in the collection of any judgment which she might obtain and which she did obtain in said action for damages; and that said Ernest I. Evans has at all times since said conveyance remained in possession and control of said properties. Paragraph 7 of the complaint, as amended during the first trial, reads:

"That plaintiff is informed and believes, and therefore alleges upon information and belief, the said defendant Ernest I. Evans was, prior to and at the time of transferring said properties above mentioned, and became, by reason of such transfer, and still is insolvent and at the time of said transfer and thereafter and by reason of said transfer said defendant's assets and the fair salable value of his assets were and now are less than the amount required to pay his then and now existing and probable liabilities and debts as they became and should become absolute and matured, and said defendant had, by reason of said transfer, and now has, no properties of any kind other than the real properties above described out of which plaintiff's said judgment and execution could be satisfied in whole or in part, and that unless said real properties be applied to the payment of said judgment the same must remain wholly unpaid. That plaintiff is without adequate or any remedy at law and unless the equitable interposition of this court is had, the plaintiff will be without remedy and will suffer the loss of her said judgment."

The appellants find a great deal of fault with this complaint. They say it is lacking in several essential allegations and therefore does not state facts sufficient to constitute a cause of action. They say it is insufficient because the plaintiff is not a creditor and her claim is not a debt within the meaning of the act, her claim being in tort and not reduced to judgment when the conveyance was made. We perceive no merit in this criticism. Section 1 of the act defines a "creditor" as a person having any claim, whether matured or unmatured, liquidated, absolute, fixed, or contingent; and says that the word "debt" includes any legal liability, whether matured or unmatured, liquidated, absolute, fixed or contingent. These definitions are comprehensive enough to include plaintiff and her claim. Additional authority, however, may be found in *Babirecki* v. *Virgil,* 97 N. J. Eq. 315, 127 A. 594, 39 A. L. R. 171, and note to that case; and *American Surety Co. of New York* v. *Conner,* 251 N. Y. 1, 166 N. E. 783, 65 A. L. R. 244, in which the opinion is written by Mr. Justice Cardozo. The complaint is criticized because it does not allege that the property conveyed was not a homestead or otherwise exempt. This is said to be a necessary allegation because section 1, in defining "assets" to mean property not exempt from liability for debts, sets up an exception as distinguished from a proviso, which must be negatived by the pleader. This objection is not well taken because section 1 neither sets up an exception nor contains a proviso, but only defines the word. See 49 C. J. 153 and note to section 169, for definitions of the terms "exception" and "proviso." Furthermore, whether this property was a homestead and so exempt from execution is a matter of defense to be pleaded and proved by the defendants (see *Giesy-Walker Co.* v. *Briggs,* 49 Utah 205, 162 P. 876) ; and therefore the contrary need not to be alleged in the complaint. They also argue that the complaint does not allege any fraudulent acts on the part of defendants, nor any facts from which fraud may be inferred, nor that the grantees in the deed had any knowledge of or partici-

pated in any fraud. This criticism cannot be sustained. Where no consideration was given by the grantees, and this complaint alleges there was none, it is not necessary to allege or prove the grantees' participation in the fraud or that the grantee had knowledge of a fraudulent intent harbored by the grantor. *Ogden State Bank* v. *Barker,* 12 Utah 13, 40 P. 765. The case holds squarely against the appellants' contention on this point. See, also *Gustin* v. *Mathews,* 25 Utah 168, 70 P. 402. Section 4 of the act declares that every conveyance made by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to the grantor's actual intent, if made without a fair consideration. While *Ogden State Bank* v. *Barker* and *Gustin* v. *Mathews,* supra, were decided long before this state adopted the Uniform Fraudulent Conveyances Act, those cases are still good law because the act does not change the law which previously existed on this point. See, also, *Adams* v. *Silver Shield Min. & Mill. Co.,* 82 Utah 586, 21 P. (2d) 886, headnote 3. Exception is taken to the complaint on the ground that the allegations concerning the insolvency of defendant Ernest I. Evans are mere conclusions, and to be available for the purpose of supporting proof must be amplified by allegations of facts sufficient to support the summarized conclusion. In support of this criticism appellants lean heavily upon what this court said by way of argument about such matters in *Smith* v. *Edwards,* 81 Utah 244, 17 P. (2d) 264, 267, as follows:

"To allege that a person is 'insolvent' is alleging a pure conclusion. Under the statute such a statement must be amplified by allegations of fact as to the amount of money required to pay his probable existing liabilities as they mature, also by an allegation of what the fair salable value of his property is, and that such 'present fair salable value is less than the amount that will be required to pay' his existing debts specifying the amounts, and when they will mature."

If that is a correct statement of the law, this complaint cannot stand, for the amplifying facts therein mentioned do not appear. With all proper deference to the learning and ability of the author of that statement, and of the mem-

bers of this court who concurred therein, the writer offers the suggestion that such is not a correct statement of law; and that it should now be disapproved. The matter goes to a point of pleading under the Uniform Fraudulent Conveyances Act, which act, however, was not before the court in that case; and is of sufficient importance, the writer thinks, to merit a re-examination. If the statement lays down the rule of pleading which must be followed in cases which shall hereafter be brought under the act, let it be so understood. But if the statement is unsound, let the correct rule be now declared so that pleadings hereafter may be drafted in the light thereof. To the writer's mind, the statement that, "To allege that a person is 'insolvent' is alleging a pure conclusion," is a debatable proposition to say the least. It is a conclusion, that is true. But is it a conclusion of law or one of fact? The opinion does not say. The writer does not undertake to answer that question from the standpoint of the principles of logic involved. For the distinctions, such as they are, between the two, which the courts have been able to state, see 12 C. J. 388 and cases cited in the note. But from the standpoint of authority, the answer should be that it is a conclusion of fact. In 49 C. J. 69, it is said:

"Some authorities have held that an allegation of insolvency is a statement of an ultimate fact, while others have held that an averment that a person is insolvent, without setting out the facts showing insolvency, is merely a conclusion of law."

Cases cited in a note to the first proposition are: *Reynolds Co.* v. *Reynolds,* 190 Ala. 468, 67 So. 293; and *Bramwell* v. *Rowland,* 123 Or. 33, 261 P. 57, 60. And to the second proposition but one case is cited, namely *Bushman* v. *Bushman,* 311 Mo. 551, 279 S. W. 122. In the Oregon case Mr. Justice Rossman, speaking for the Supreme Court of that state, says "To allege that one is insolvent is not the statement of a conclusion of law, but states the ultimate fact," and cites as authority: *Grunsfeld Bros.* v. *Brownell,* 12 N. M. 192, 76 P. 310, and *Gray* v. *Brunold,* 140 Cal. 615, 74 P. 303. Both cases are in point. If to allege that a person is or was at a

certain time insolvent is to allege but a legal conclusion, then such allegation has no business in a pleading under our Code system, which requires the pleader to state the facts constituting the cause of action in ordinary and concise language; while, on the other hand, if it is a conclusion of fact, by which we mean an ultimate, issuable fact, then it needs no amplification in order to admit the evidentiary facts which supports the conclusion. It ought to be sufficient, we think, in a case of this kind, to allege, in addition to necessary matters of inducement, that at a certain time the defendant accused made the conveyance which is attacked; that he was then insolvent, if such be the fact, or that he was thereby rendered insolvent, if that be the fact; and that such conveyance was made without any consideration passing from the grantee to the grantor therefor, or that a fair consideration was not paid, according to the fact which the pleader intends to prove. Such allegations are found in this complaint and, we think, bring the case squarely within section 4 of the Uniform Fraudulent Conveyances Act. But if that be not sufficient, we have in this case the additional allegation to the effect that execution had been issued on plaintiff's judgment and returned wholly unsatisfied. The case of *Ogden State Bank* v. *Barker*, cited above to another point, is sufficient authority to sustain this complaint. That case was decided, however, many years before the state adopted the Uniform Fraudulent Conveyances Act, and so may be said not to be strictly in point; but there seems to be no good reason for holding in effect that a complaint which was good under the former law is bad under the act. It is said, finally, that the complaint is bad because there is no allegation therein to the effect that defendant Ernest I. Evans was solvent when he made this conveyance. This criticism is based upon a construction of section 4 which is stated in the brief as follows:

"Every conveyance made and every obligation incurred by a person who is thereby rendered insolvent and every conveyance made and

every obligation incurred by a person who will be thereby rendered insolvent," etc.

No argument is made and no authorities cited in support of this construction. If that is what the Legislature meant to say, then we have a situation where persons who are insolvent may give away their properties without regard for the rights of their creditors, while those who are solvent may not do so. It is almost self-evident from a reading of the whole act that no such result was intended. The plain meaning of section 4 is that every conveyance made by a person who is insolvent, and also every conveyance made by a person who will be thereby rendered insolvent, is fraudulent as to the grantor's creditors without regard to his actual intent, if made without a fair consideration. The complaint is sufficient to state a cause of action; it is not objectionable upon any of the grounds above stated.

3. In passing to the subject of consideration, we begin our discussion with a finding of fact made by the trial court which reads in part as follows:

"That at the time said real property was given and delivered as aforesaid nothing of any value was paid or delivered therefor to defendant Ernest I. Evans by his said daughters, Mrs. Snarr and Mrs. Tanner except the sum of $10.00 and no other thing of any value whatsoever was given to, or obtained by said defendant Evans at that time or theretofore, or thereafter from said defendants Mrs. Snarr and Mrs. Tanner or any one else for the conveyance of said real properties."

The court also found against the allegations of the answers concerning the consideration. The question is whether or not the evidence supports the findings, or does it show that the grantees in the deed paid a fair consideration for the property. The following facts are not disputed: The accident in which plaintiff was injured by reason of Dr. Evans' negligence occurred on December 31, 1929; the deed was signed and acknowledged on November 18, 1930, while the action for damages was pending, but was not delivered or recorded until November 29, 1930, when it was delivered

by Dr. Evans to one of the grantees and by her placed of record; judgment was entered in plaintiff's favor in the personal injury action on November 26, 1930, or eight days after the date of the deed and three days before it was delivered and recorded. It is agreed by all parties to the suit that Dr. Evans was insolvent when he executed this conveyance; and the record shows that an execution had been issued upon plaintiff's judgment which had been returned by the sheriff wholly unsatisfied shortly before the complaint was filed in this case. The grantees are children of the grantor. The deed recites a consideration of $10 and other good and valuable considerations; but nothing whatever of value was given by the grantees at the time of its execution, except the sum of $10. The defendants allege in their several answers that the consideration for the conveyance was money, aggregating $3,000, which the grantees had advanced or given to their father in small amounts from time to time over a period of several years and their assumption and agreement to pay a debt for some $2,375 which he owed to one Adams and which was represented by a promissory note signed by the father and two daughters. The only witness who testified upon the subject of the consideration was Dr. Evans himself, who was called by the plaintiff. The two daughters were in court throughout the trial, and at the close of his testimony the trial judge suggested to their counsel that they be called as witnesses to relate what they knew upon the subject, and even intimated, when counsel declined to comply with the suggestion, that the court itself might call them. Counsel, however, objected to and they were not called and did not testify. Dr. Evans' testimony given in direct examination upon this subject is as follows:

"Q. On the date that you delivered the deed to your daughter in the City and County Building, did your daughter hand you any money? A. No, she didn't on that day.

"Q. Did she hand you any consideration of any kind on that day? A. I wouldn't say definitely. I don't think she did on that date.

"Q. Well, you are sure she didn't aren't you? A. I don't remember of receiving any on that date.

"Q. Any kind of consideration? A. I received some consideration.

"Q. I am talking about this date that the deed was delivered. That is the only question I want to ask you, on the date that you delivered this deed at the County Building, if she gave you any kind of property or money or anything at all? A. She gave me ten dollars, I know that.

"Q. She gave you ten dollars on that day? A. I wouldn't say positive whether it was on that day or whether it was the day before.

"Q. What did she give you ten dollars on that day or any other time prior to that for? A. For the deed.

"Q. For the deed? A. Yes, sir.

"Q. Did Eloise give you anything on that date? A. She didn't pay me at all. I think she paid the other daughter.

"Q. I am speaking of that day, she didn't pay you anything? A. Not that I recollect."

The witness was thereupon turned over to his own counsel for cross-examination and thereupon testified in part as follows:

"Q. You say that sometime at about the date when you delivered this deed to Margaret, that she paid you ten dollars. Do you remember when that was with respect to the time of the delivery of the deed? A. Well, I think it was a day or two before I had the deed made out. I wouldn't state positively.

"Q. A day or two before you had it made out? A. Yes, had the deed made out.

"Q. Now the deed recites $10.00 consideration, what did that other good and valuable consideration consist of? (An objection was sustained to this question.)

"Q. Doctor, in addition to the $10.00 you have testified to, was there any other consideration given you for this deed at any time? A. Yes.

"Q. Was there anything in the nature or form of a promissory note assumed or other such obligation? (Objected to as leading, objection sustained.)

"Q. Well, what else other than $10.00 did you receive, if anything? A. I have received money.

"Q. From the girls? A. Yes.

"Q. And in what amounts? A. Well, Margaret, I think it was, approximately around about $1700.00 from one and $1,300.00 from the other.

"Q. Was that money received before or after the transfer? A. Before.

"Q. At one time or on several occasions? A. On several occasions.

"Q. And was there any other kind of property or consideration received by you from these girls for this deed? A. There was a note that they were on."

The witness produced the note and was asked to state any conversations which he had with his daughters with respect to payment thereof, which occurred in 1926 or 1927 when they signed the note. We quote:

"A. As I recall it, when they went on this note with me, I told them that I would protect them with the home there.

"Q. Well, now, is that all that was said? A. Well, I had received some money from them before that and I owed them some money there —and then when they went on the note, why, I told them I would protect them with the home there.

"Q. Well, what did you say with relation to you would protect them with the home; tell us the conversation, what you said to them? A. I told them I would deed it over to them—

"Q. What was said between you and them, what did you say, if anything, with relation to those advances and the deed, and what did they say, if anything? What was said, what did you say and what did they say, if anything, with relation to those advances and the deed? A. Well, I told them I wasn't able to pay them, or this note, and they was to receive the property for that.

"Q. For the advances and the note? A. Yes.

"Q. Is that right? A. Yes, sir.

"Q. And what did they say? A. They were willing to accept it. They said they would take the obligation of the note for the property.

"Q. What did they say, if anything, with relation to the cash advances? A. The cash advances?

"Q. Yes. A. Well, they would call it paid.

"Q. They said they would call it paid? A. Yes."

The witness then being returned to counsel for plaintiff for redirect examination was interrogated at great length and in much detail concerning the advances, when they were made, the amounts thereof, and any conversations had between the parties relating to payment and so forth. The court also interrogated the witness upon the same subject. Nothing additional, however, was developed except the statement that the witness kept no account of the advances, but that his daughters or one of the daughters did have an account of them, and the further statement that he did not know the total of the advances but was sure Margaret's amounted to more than one thousand dollars and Eloise's to thirteen hundred. It is impossible without setting out his testimony in full to give a fair idea of the manner in which this witness testified and the character of his testimony. To set it out in full, however, would extend this opinion far beyond all reasonable limits; so we have therefore given only his testimony in direct examination and the greater part of his cross-examination upon this subject, to represent the whole thereof.

This being a suit in equity, the appellants are entitled to the judgment of this court upon the facts found by the trial court respecting the consideration. If this court accepts at face value the testimony above quoted, the natural inference therefrom must be contrary to the findings. If Margaret did in fact lend her father $1,700 and if Eloise did in fact lend him $1,300, and if they did sign the note with him to Adams, all under his promise to convey the property to them in consideration therefor, then there was in fact a fair consideration paid by them for the property, which, it is stipulated, was of the value of $3,350. But, on the other hand, if this court does not believe that the

advances were actually made, or, believing that, if it does not believe there was any promise or agreement to convey the property in consideration therefor, then the findings must be approved; for aside from the testimony of the witness, the facts about which there are no disputes are amply sufficient to sustain the finding that this was a voluntary conveyance. After a careful reading of the entire testimony of this witness, and weighing the same along with the admitted facts in the case, we do not feel satisfied that the finding ought to be disturbed. The trial judge did not accept the testimony of this witness in full. The trial judge had a better opportunity from seeing and hearing the witness than we have from merely reading the transcript to appraise his credibility and to determine what weight should be given to his testimony. The opinion of the trial judge is therefore entitled to some weight with us. The transcript shows that the witness was hesitant, evasive, and lacking in frankness in his answers to many of the questions; that his memory was poor and uncertain, and, in some instances, wholly lacking, in regard to many subjects about which we might reasonably expect more satisfactory answers than he gave if he were entirely truthful. Finally, if he testified truthfully in regard to the advances, in regard to the conversations which were had between himself and daughters about conveying the property to them, and in regard to the daughters keeping an account of the advances, why did they not take the stand and give the evidence which in the natural course of things would corroborate their father? This issue of consideration was of vital importance in the case. The trial court was properly desirous of having as much light cast upon that issue as it was possible to obtain so that the truth might be disclosed. For the daughters to sit by and refuse to give their testimony when invited by the court to give it in regard to subjects which they must know about, if their father was telling the truth, gives rise to a conviction in our minds that they did not testify because they feared that what they might say would be against their in-

terest; and casts grave doubt upon the veracity of their father. It is probably true that the daughters did advance some money to their father during the period mentioned by him, but his testimony is quite unsatisfactory as to the amount. We can well believe that the daughters signed the note with him to Adams. But we are not prepared to believe, from a consideration of all the evidence in the case, that there was any agreement whatever between the father and daughters for repayment of the advances or that he would convey the property to them in consideration for the advances and for their signing the note with him. This was an idea born in his mind when he beheld himself confronted with the action for damages. The findings in regard to the consideration are therefore approved.

4. Directing our attention next to the homestead question, it is necessary to state the following facts which are pertinent to that subject: The conveyance was made by warranty deed, dated November 18, 1930; it was delivered by the grantor to one of the grantees and recorded in the office of the county recorder of Salt Lake county, Utah, on November 29, 1930. The property described in the deed consists of two parcels. Parcel 1, which is referred to in the evidence as the Windsor street property, is a lot with a five-room dwelling house thereon, situated at No. 1092 Windsor street, Salt Lake City. Parcel 2 consists of three vacant lots situated in a good residential district of said city. It is stipulated by counsel for the respective parties that parcel 1 at the time of the conveyance was of the fair market value of $2,800, and parcel 2 of the fair market value of $550.

At the date of the conveyance Dr. Evans was a widower, his wife having died in May, 1929; he had not remarried and had no minor children. He had no one whatever dependent upon him for support and maintenance, unless it was his daughter Eloise. At that time Dr. Evans and Eloise were residing together in an apartment in Salt Lake City. He was a practicing dentist, admittedly insolvent, owning

no property except the real property involved in this case and the tools of his trade and some office equipment. She was past the age of majority, was then and for some years prior thereto had been employed at fair wages, and, from a short time after her mother's death to shortly before the deed was made, had been residing with a friend in an apartment other than the one occupied by her father. Her father also testified that during the past few years she had supplied him with money to the aggregate amount of $1,300, which is part of the claimed consideration for the conveyance. From the foregoing, which is substantially all the evidence in the case bearing upon the subject of dependency, the trial court found that Dr. Evans had no one under his care and maintenance when he made the conveyance. Such finding is assigned as error. But it seems to us the trial court drew the natural and reasonable inference from the evidence. It looks as if Eloise was not only self-supporting, but if there was any relationship of dependency between them, it was the other way about. So, for the purpose of the inquiry concerning the application of the homestead laws, the finding of the trial court will be accepted as stating the fact.

From the time he acquired title to the real property up to the death of his wife, in 1929, Dr. Evans resided with his wife and family in the house at No. 1092 Windsor street; but some time about January 1, 1930, he moved to an apartment up town, where he resided alone for a time and then moved to the apartment where he and Eloise resided at the time the deed was executed. He returned to No. 1092 Windsor street about March, 1931, and resided there with his daughter Margaret and her family.

The question to be decided is whether or not a person whose family relationship has been broken up by the death of his wife and the emancipation of his children has a right to claim, as against his creditors, a homestead exemption in real property which he may own. That Dr. Evans, while his wife lived, had such right, by virtue of which he might

claim either the Windsor street property or the vacant lots or both to the extent of the values permitted by statute, is a proposition which cannot be and is not denied. But whether he had any homestead right whatever when he conveyed those properties to his children, being then a widower with no dependents, is an issue now before this court for its decision.

As a preface to the discussion, a brief glance at the history and nature of the homestead right may be helpful. There was no such thing as a homestead right at common law. *Evans* v. *Jensen et al.,* 51 Utah, 1, 168 P. 762, 763, L. R. A. 1918B, 812; *Cook* v. *Higley,* 10 Utah 228, 37 P. 336; 29 C. J. 383, § 3. The author of the article in Corpus Juris, under the title "Homesteads," says:

"The homestead interest depends entirely on organic or statutory provisions, nothing like it being known at common law; and there can of course be no greater right in the homestead property than is created by these provisions. Because of the difference in the wording of the homestead laws in the various jurisdictions, the interest created thereby differs widely."

In a historical note to the above article, at page 782, we learn that:

"Homestead laws are strictly of American origin. The earliest statute of this kind was that enacted by the Republic of Texas, Jan. 26, 1839. * * * The first constitutional guaranty of homestead exemption was that of the constitution of Texas in 1845, which was followed by Vermont in 1849. Since the latter date, nearly every state and territory in the Union has adopted similar laws, which recognize the general right of homestead, but differ radically in their details. For a discussion of the development of homestead law see *Barney* v. *Leeds,* 51 N. H. 253, 261."

As might naturally be expected, from the fact that the homestead law has been developed out of the varying needs and customs of people living in some forty-eight separate jurisdictions, when we come to examine the law upon any particular point connected therewith, we find such a wide diversity in the constitutional and statutory provisions and

in the reported cases from other states, that few, if any, general principles are deducible from them which can be laid down as safe guides to sound conclusions. A decision upon any point must turn upon the wording of the statute or of the constitutional provision involved, so that the holdings in other states thereon afford but slight aid to an understanding or correct application of the law. We proceed, therefore, without further preliminary, to those provisions of the Constitution and statutes of this state which seem to bear upon the issue to be decided.

The Constitution says:

"The Legislature shall provide by law, for the selection by each head of a family, an exemption of a homestead, which may consist of one or more parcels of lands, together with the appurtenances and improvements thereon of the value of at least fifteen hundred dollars, from sale on execution." Article 22, § 1.

In *Evans* v. *Jensen,* supra, this court, speaking through the late Mr. Chief Justice Frick, says, concerning this section:

"What the Constitution thus enjoins is that a certain homestead exemption shall be provided for each 'head of a family.' Persons who do not possess that status are necessarily excluded from the foregoing constitutional provision, and they are likewise excluded from the statute which was passed by the Legislature of Utah in obedience to the foregoing mandate."

See, also *In re Schenk's Estate,* 53 Utah 381, 178 P. 344, and particularly Justice Frick's concurring opinion in that case. Comp. Laws Utah 1917, § 2898, as amended by Laws Utah 1923, c. 71 p. 142, which was in force at the date of the transaction with which we are now concerned, reads:

"A homestead consisting of lands and appurtenances, which lands may be in one or more localities, not exceeding in value with the appurtenances and improvements thereon the sum of $2,000.00 for the head of the family, and the further sum of $750.00 for his wife, and $300.00 for each other member of his family, shall be exempt from judgment lien and from execution or forced sale, except as provided in this title."

Section 2905 informs us who is to be regarded as the head of a family under the homestead law in the following language.

"The phrase 'head of a family' as used in this title includes within its meaning: 1. The husband or wife, when the claimant is a married person; but in no case are both husband and wife entitled each to a homestead under the provisions of this title, except to the extent hereinbefore provided; 2. Every person who is [it should be has] residing on the premises with him or her and under his or her care and maintenance, either: (a) his or her child * * * or any other of the relatives mentioned in this section, who have attained the age of majority and are unable to take care of or support themselves." (In earlier and also in later official publications of the laws where this section appears, the fourth word in subdivision 2 is "has" instead of "is," from which we infer the latter is probably an inadvertence or a misprint.)

See R. S. Utah 1898, § 1154; Comp. Laws 1907, § 1154; R. S. 1933, 38-0-5.

The statutes further provided that:

"In case the husband or wife desert his or her family, the exemption shall continue in favor of the one residing upon the premises." Comp. Laws 1917, § 2908.

Also:

"If the homestead claimant is married, the homestead may be selected from the separate property of the husband, or, with the consent of the wife, from her separate property." Id., § 2899.

There are other sections in the chapter on homesteads, but as none of them seem to shed any light upon our present question, we do not set them out herein. In the chapter relating to the descent and distribution of real property, however, it is provided that a homestead not exceeding in value the sum of $2,000, and $250 additional for each minor child, shall be wholly exempt from the payment of the debts of the decedent, and shall be the absolute property of the surviving husband or wife and minor children, or of the minor children in case there be no surviving husband or wife, to be set apart by the court in the course of probate proceedings at

any time after the return of the inventory; such property to be subject only to encumbrances given for the purchase price or by the consent of both husband and wife and mechanic's liens. It is expressly provided, however, that this section shall not be construed to prevent the disposition by will of the homestead. Id., § 640. In the case of *In re Schenk's Estate,* supra, this court was called upon to apply section 6409, but under a different number, to a situation where a deceased husband had disposed of the homestead by will, leaving his wife but a life estate therein, which she refused to accept. The case is not in point here but is mentioned as an instance where the court felt that it was obliged to follow the plain language of the statute and was powerless to read into the law something which was not there but which in the opinion of the court ought to be there. In the Probate Code it was also provided that when a person dies leaving a surviving wife, husband, or minor children, they shall be entitled to remain in possession of the homestead until otherwise directed by the court. Id., § 7643. In *Bunker* v. *Coons,* 21 Utah 164, 60 P. 549, 551, 81 Am. St. Rep. 680, which cites *Kimball* v. *Salisbury,* 17 Utah 381, 53 P. 1037, and *Kimball* v. *Salisbury,* 19 Utah 161, 56 P. 973, this court had occasion to construe R. S. 1898, §§ 1147 and 1154, which were identical, except in regard to the value of the property exempted, with Comp. Laws 1917, §§ 2898, as amended in 1923, and 2905, respectively, and apply them to a situation where the claimant was a single man, whose family consisted only of himself and his aged mother, and who did not reside upon the land. In that case the court said:

"The fact that there was no dwelling house upon the homestead, and that plaintiff's mother resided with him one-half mile therefrom, did not deprive him of his homestead right, when it appears that the proceeds of the land were used for the support of his family, and the value of the land was within the homestead limit fixed by statute."

In *Payson Exch. Sav. Bank* v. *Tietjen,* 63 Utah 321, 225 P. 598, 600, this court says:

"Nor is it necessary, in this state, that the premises that are claimed as a homestead are occupied or used as such, but any real estate that the judgment debtor owns or in which he holds some estate may be claimed as his homestead to the extent of the value allowed by the statute."

Subdivision 2 of section 2905 must therefore be understood and applied in the light of these holdings; and when so understood we see that actual residence upon the land is not a requisite, although the express language of the statute seems to imply otherwise. This construction was necessary to harmonize section 2905 with section 2898, which allows the exemption to lands in one or more localities.

It is apparent, from a reading of our statutes and the section of the Constitution above mentioned, that nowhere in them is to be found any provision which in express terms creates or recognizes the existence of a right to a homestead exemption in any person who is not a member of a family. The only person who may select the land to be exempted as a homestead is the head of a family, and the only persons for whose benefit the exemption exists are the members of a family. The nearest approach to anything like a recognition of the right in a single person detached from the family relationship is found in section 2908, under which one spouse who has been deserted by the other may still claim the exemption; and in section 6409, under which the exemption extends in favor of the surviving spouse in the lands of the deceased spouse and as against the debts of the deceased, and also a minor child might claim the homestead exemption in his parents' lands free from the parents' debts in case no husband or wife survives. But this latter section does not go so far as to say in express terms that the homestead, when set apart, shall thereafter be exempt from the debts of the distributee. This situation, however, is taken care of, in part at least, in case the distributee can still qualify as the head of a family under section 2905, for then the right belongs to him by virtue of the Constitution and of section 2898. In all other cases than those last mentioned, the home-

stead exemption is clearly a right which has been created by the people of this state, directly by the adoption of the Constitution and indirectly through their representatives in the Legislature, for the immediate benefit of members of a family, which, as the word is used here in a restricted rather than in a generic sense, is a group of two or more persons dwelling together under one head, and which cannot consist of but one person. It follows as a natural conclusion from what has been said, we think, that if a single person detached from all family relationship has the right to a homestead exemption, or if the right which once existed may be said to survive the breaking up of the family relationship, such must be the law because of something which is implicit and not expressed in the statute. To support a holding to that effect the court would have to find the law by some process of judicial construction of the statutes, for it is not expressly written therein as it is in some states. But there seems to be no room for construction of the statutes in this respect. There are no seeming conflicts to be reconciled, as there were in *Bunker* v. *Coons,* supra; there are no terms of doubtful meaning to be elucidated; the legislative intent is not doubtful, but is expressed in clear and unmistakable language. The Constitution says the Legislature shall provide by law an exemption to be selected by each head of a family; the statute says who is the head of a family and how much the exemption shall be for the various members thereof. Those who are qualified under the statute are entitled to the benefit of the exemption; while under the maxim that, when a statute enumerates the things upon which it is to operate, it is to be construed as excluding from its effect all those not expressly mentioned, those who cannot qualify under the statute are to be excluded from its operation. We are not aware of any rule of construction that can be invoked to aid the appellant's claim on this point. Therefore, we feel constrained to hold, looking at the case solely from the standpoint of the statutes and Constitution of this state, that Dr. Evans had no right to a homestead exemption when he made

this deed in favor of his daughters; and that the right which he did have while his wife lived did not survive to him after his wife died and his children had all attained their majorities and were no longer under his care and maintenance, because he was not then the head of a family; and that he cannot qualify under subdivision 2 of section 2905 because it does not appear that when he made this conveyance his daughter Eloise was under his care and maintenance, although it does appear they were residing together in the same apartment at that time.

The question of the survivorship of the homestead right, or the continuation of the exemption of the homestead property from the debts of the claimant—as one will discover upon reflection, there is a difference between the two ideas —after the dissolution of the family relationship, has been before the courts of last resort in many of the states. It is said there are two lines of holdings. In a majority of the states it seems the law is that the right or the exemption survives. In some of the cases on the majority side, however, the holdings are based upon statutory provisions which in express terms or by necessary implication support such holding. In others various reasons have been assigned for the conclusions reached. In *Palmer* v. *Sawyer*, 74 Neb. 108, 103 N. W. 1088, 12 Ann. Cas. 715, in a state where the statutes are very much like ours, the court took the majority view because, looking at the general scope and spirit of the law, it seemed to be the intention of the Legislature that the right should survive. There is a note following that case in the selection of cases mentioned in which many of the cases pro and con are cited. In *Weaver* v. *First Nat. Bank of Chicago*, 76 Kan. 540, 54 P. 273, 16 L. R. A. (N. S.) 110, 123 Am. St. Rep. 155, where the statutes are also very much like ours, and which overrules *Ellinger* v. *Thomas*, 64 Kan. 180, 67 P. 529, the court seems to have held the law to be that the right survives because the court thought that is the way the law ought to be. Perhaps enough has been said to indicate that we do not believe such cases are based upon sound reasons.

It is not our purpose to review the cases in other states. No good could come from doing that. Any one interested in pursuing the subject may find the cases assembled in the collections of cases above mentioned and in 29 C. J. 931. It is sufficient to say that we think the question ought to be decided upon the basis of what the law is in this state and not upon the basis of the law in other states. In cases where rights depend wholly upon statutes which differ widely in many particulars as the homestead laws do, although quite similar in general outline and purpose, it does not help much to count noses.

There has been some discussion in this case upon the subject of abandonment of the homestead right. But it seems to be unnecessary for us to decide any of the questions relating to that matter, since we hold there was no such right when this deed was executed. It would seem, however, that there can be no such thing as an abandonment of the right in this state. A person has the right or he has it not. He might, if he owns more than one parcel of land, claim the right as to one piece and later abandon that as his homestead and claim another. But it is difficult to see how one may be said to have abandoned the right by moving away from the land and taking up a residence elsewhere within the state, since, by the express provisions of the Constitution and the statutes, he may claim an infinite number of parcels anywhere within the state up to the value mentioned in the statute.

There are two other subjects which require brief mention. The appellants assign error upon the refusal of the court to admit the Adams note in evidence. The note might well have been received to corroborate the witness' testimony that there was in fact such a note and such a debt. But if there was any error in its exclusion, the same was harmless because its admission could not have changed the result. It is argued that this conveyance must be sustained because Dr. Evans had the right under the laws of this state to pay his debt to his daughters in preference

to the debt to the plaintiff or any one else. The answer to this argument is that if there was no debt, there could be no preference. The trial court held and we do likewise hold that there was no debt.

Finding no errors in the record, the judgment is affirmed. Appellants to pay the costs.

ELIAS HANSEN, C. J., EPHRAIM HANSON, J., and E. E. PRATT, District Judge, concur.

FOLLAND, Justice.

I concur. The decision disapproves a statement in a previous decision of this court in *Smith* v. *Edwards*, 81 Utah 244, 17 P. (2d) 264, 267, to the effect that "to allege that a person is 'insolvent' is alleging a pure conclusion," and holds that an allegation of insolvency is the allegation of an ultimate fact and is a sufficient allegation of insolvency without the allegation of the probative facts. Because of this holding, I desire to add the following observations and citation of authority: Such an allegation is sufficient in this kind of case, and this view, I think, is supported by the great weight of authority. The rule applicable in cases of fraudulent conveyances is stated as follows in 27 C. J. 771:

"Insolvency may be a sort of conclusion from other facts, but it is also that kind of a collective fact which is a well understood and recognized pecuniary condition and may well be averred in terms, for this is equivalent to averring that the debtor does not own property enough to pay his debts, and on the other hand if the facts alleged in the bill show that the debtor was insolvent, his insolvency need not be alleged in terms. An allegation that the debtor did not have at the time of the conveyance and has not since had up to the time of the commencement of the suit sufficient property subject to execution to pay his debts is a sufficient averment of his insolvency."

The proposition that insolvency may be alleged in terms without stating the probative facts is supported by the following, in addition to the cases cited in the prevailing opinion: 3 Bancroft Code Pleadings, p. 2406; *Rohr* v. *Stanton*, 78 Mont. 494, 254 P. 869; *Anders* v. *Kiser* (S. D.) 256

N. W. 115; *Coal City, etc.,* v. *Hazard Powder Co.,* 108 Ala. 218, 19 So. 392; *Oshry* v. *Haddad,* 265 Mass. 199, 164 N. E. 69; *Lammert* v. *Stockings,* 27 Ind. App. 619, 61 N. E. 945. In other cases (particularly involving receiverships), it is said that while the allegations may be "safe from general demurrer * * * it would seem not to be safe from attack by a special demurrer which specifically objected to the generality of its language." *Hobson* v. *Consolidated Management Ass'n,* 19 Del. Ch. 121, 163 A. 621; *Sill* v. *Kentucky Coal & Timber Dev. Co.,* 11 Del. Ch. 93, 97 A. 617.

MOFFAT and WOLFE, JJ., being disqualified, did not participate herein.