332 P.2d 981

Harry CHILD, also known as Henry Child, Plaintiff and Respondent,

v.

Eugene A. CHILD and Arvilla Child, his wife, Defendants and Appellants.

No. 8869.

Supreme Court of Utah.

Dec. 20, 1958.

J. Grant Iverson, Salt Lake City, for appellants.

Child & Spafford, Ramon M. Child, Woodruff C. Gwynn, Salt Lake City, for respondent.

CROCKETT, Justice.

Defendants, Eugene A. Child and his wife, Arvilla, were directed to reconvey certain land to Eugene's father, plaintiff Harry Child, upon the ground that they held it in trust for him. They appeal.

The essence of defendants' position is this: that Eugene received the property by deed from his father, which establishes title in him, and that it has not been assailed and overcome by the requisite burden of clear and convincing evidence.[1] The question presented here is whether there is a reasonable basis in the evidence to support the view of the trial court that that burden was met.

The plaintiff having prevailed below is entitled to have us survey the evidence, and every reasonable inference and intendment that can fairly be drawn therefrom, in the light most favorable to him.

The disputed land is a tract of 20 acres in the foothills against the Wasatch Mountains southeast of Bountiful in Davis County. It is rough and dry, covered with oakbrush, and until recently of little value. It was formerly owned by a Mrs. Griffith who lived in California. Plaintiff, Harry Child, foresaw future value in the property, and in 1941 made her real estate agent, Mr. R. O. Warnock, of Salt Lake City, an offer of $300, which was rejected. Mrs.

1. Chambers v. Emery, 13 Utah 374, 45 P. 192; Kitt v. Kitt, 4 Utah 2d 384, 294 P.2d 791.

Griffith died in 1945, and Harry Child renewed his offer to Mr. Warnock, which was accepted on behalf of her estate. He paid $25 down and was given time in which to raise the $275 balance.

It is pertinent here to note that Harry Child and his wife, Hazel (since divorced, in 1955) Eugene's mother, did not agree on such matters, and that she apparently did not share his enthusiasm for buying this property. He owned some water stock which he wanted to pledge to the bank to get the money, but she had the certificates and refused to let him have them for that purpose. Eugene was then a boy of 17 and away in the Navy. He had sent money home which his mother held in a joint account with him. Harry requested her to lend him the necessary money from this fund, which she also refused. Harry then asked her to write to Eugene asking him to lend the money. Hazel testified that on her own initiative she suggested in the letter that Eugene might want to buy the property for himself if he didn't want to make the loan to his father.

Eugene's letter in reply is of critical importance, but it was not available as evidence, so the parties were permitted to testify as to its contents. About it there is sharp dispute. Hazel Child testified that Harry received the letter and was the first person to read it when it arrived. Both she and Eugene stated that in it Eugene refused to lend the money to his father, and said that if the property was purchased, it should be for him. On the contrary, Harry Child said that Hazel received Eugene's answer to her letter and read it, informing him that Eugeme consented to lend him the money. But it was agreed that the title be placed in Eugene's name to assure repayment of the loan. The undisputed fact is that Hazel withdrew the money from Eugene's account and gave it to Harry, who took it to Mr. Warnock and had the deed made out to himself. Later, on his own initiative, he had a deed made from himself to Eugene, and had it recorded.

It seems likely that this property would have remained in the family and followed the normal course, without giving rise to trouble, except for two things, which may be interrelated. The first is that there was an unprecedented increase in value so that it became worth between $40,000 and $50,-000. This was due in part to the general appreciation in land values, particularly in Davis County, whose population burgeoned during and after World War II; but more to the Weber Basin Reclamation Project, making water available so the property can be used for residential purposes. The second is that family strife also increased, resulting in the divorce between Harry Child and Hazel in 1955; and that other troubles, revealed in part by the discussion below, precipitated this lawsuit.

It is not to be gainsaid that there is evidence which can be viewed as pointing both ways on the critical issue in dispute: whether the deed from Harry Child conveyed full fee ownership to his son, Eugene; or only placed title in him to assure repayment of the money he advanced his father to purchase the property. The evidence of each party, if it could be viewed separately, would be susceptible of interpretation that he assumed that he owned the property.

Arguing his claim of ownership, Eugene points not only to the deed from his father, but to these additional facts: that he deeded a half acre of the land to the United States Government for use in connection with the establishment of a pumping plant; sold a right of way over part of it; sold and caused to be removed topsoil from a considerable portion of it; and that he mortgaged the property twice to the bank. And further, that he paid the taxes on the property for all but two years, which were paid by his father. In fairness, it must be admitted that this evidence, if viewed alone, would be persuasive indeed. However, it cannot be so regarded, but must be considered in the light of the whole picture, and against the plaintiff's evidence and contentions with respect thereto, including the all-important consideration that the latter was the view adopted by the trial court.

In support of his testimony that the transaction was a purchase of the property for himself and his declaration that the deed was not intended to convey absolute title to Eugene, but was for the latter's security, these points are made by Harry Child: that it was he who conceived the original idea of purchasing this property and nourished it to fruition; that notwithstanding Eugene's claim that his father, Harry, purchased the property solely for him, neither Eugene nor his mother, Hazel, who is on his side supporting him in this controversy, claim that he ever expressly stated that he would do so. Such result would have to be made out from the letter, which they failed to produce. They do not point out what Harry Child was to gain by turning over his favorable option to Eugene and carrying out the details of the transaction and doing all the work on the property he did, all for the benefit of a son, whom they now claim at age 17 did not trust his own father and declared that he would not loan him money. If Eugene is to prevail it must be upon the basis that he was that kind of a son, but that his father benignly overlooked the rebuff and in spite of it, put in several years' time and effort to see that Eugene got the sole benefit from this property. The trial court's acceptance of a different view of the transaction certainly does not do violence to reason in the opinion of the writer.

Consistent with Harry Child's claims and the findings of the trial court are the undisputed facts that he went into possession of the property, obtained railroad ties and the other necessary materials and with his own labor fenced the entire tract; and that he has continued to pasture his cows and horses therein; and has at all times remained in possession and exercised general dominion over it.

The question naturally arises whether the facts pertaining to Eugene's activities in regard to the property are so contrary to or discrediting of Harry Child's version of the transaction that the trial court could not reasonably regard the whole evidence as clear and convincing in his favor. In that respect Harry's position is that the payment of the taxes by Eugene and other dealings with his father's property were done because it was "all in the family"; that as to the topsoil, Eugene sold and permitted it to be removed over his protest, not only from part of that land, but also from another tract Harry owned nearby; that Eugene accomplished his dealings with the title of the land because the property was in his name and without consulting his father about it. He says, not unreasonably, that he let Eugene get by with things that he would not have indulged in anyone else because of his desire to avoid trouble in the family; but that he finally felt compelled to bring this lawsuit when he first learned that the property was being mortgaged to the bank at the time of the second mortgage being placed.

In approaching an appraisal of the evidence to answer the question whether it could reasonably be regarded as "clear and convincing" in support of plaintiff's position, it is well to have in mind, at least to the extent we are able to define it, just what that concept embodies. How much more proof is required, and how to evaluate evidence as bearing thereon as compared to contrary evidence, is one of the facets of the general problem of appraising evidence.

Passing upon the credibility of witnesses involves to some extent the judging of what goes on in the minds of others and is therefore fraught with uncertainty. Whether one believes a witness is telling the truth often depends as much or more upon the impression the witness is making as upon the words he says. His appearance and demeanor, his manner of expression and tone of voice, his apparent frankness or candor, or the want of it; his forthrightness in answering, or his tendency to hesitate or evade, and in fact his whole personality go into the composite effect of the testimony. This is so even though the hearer may not be paying particular attention to nor separately evaluating such factors. In addition to the personality aspects involved in the interpretation and evaluation of testimony, there are also difficulties to be encountered because

of the uncertainties found in fact situations themselves which must be correlated to the testimony of the witnesses. We have heretofore pointed out the trial court's advantages in judging the credibility of witnesses and determining the facts.[2] It is due to these considerations that it is firmly established that passing on such matters is exclusively within his province.[3]

When an attack is made upon the lower court's findings on the ground requiring an appraisal of the weight of the evidence, this court is also confronted with difficulty as to what went on in the mind of the trial judge as to his belief of witnesses and finding the facts. It is because of the sanctity with which the law regards written documents that the rule has become well established in this jurisdiction that to find the deed had a purpose other than appeared on its face requires clear and convincing evidence. Just how to define that requirement quantitatively presents difficulties. About all that can be said is that it implies something more than the usual requirement of a preponderance, or greater weight, of the evidence; and something less than proof beyond a reasonable doubt. The words "clear and convincing" have a meaning which is commonly known and understood. Attempting refinement beyond that, for the writer at least, results only in finding synonyms for those words and provides nothing more definite or helpful as to the quantum of proof.

In surveying the evidence to see whether that test is met it must be kept in mind that the complexities of human nature and the diversities of experience are such that there may be considerable difference in the views reasonable minds will take of the same evidence. This is constantly being demonstrated by the divergence in opinion within the judiciary itself on questions of both law and fact. The variance in view rational minds may take of the same evidence may be likened to the swing of a pendulum from one side to another. A fairly wide central arc in the pendulum's swing would represent that zone within which reasonable minds could view the evidence. The extremes beyond that area on either side would be outside the bounds of reason. If the finding can be seen to fall clearly within the central zone, or clearly beyond it on either side, it is easy to see that the finding is right, or that it is wrong, just as it is easy to tell the light of day from the darkness of night, or black from white. But it is in the nebulous area where the zones merge, just as in the uncertainty of the twilight, or where the colors are mixed and mottled,

2. Zuniga v. Evans, 87 Utah 198, 48 P.2d 513, 101 A.L.R. 532; Nokes v. Continental Mining & Milling Co., 6 Utah 2d 177, 308 P.2d 954.

3. Ibid, and see VII Wigmore, Evidence, § 2034 (3d Ed. 1940).

that difficulty is found in reviewing determinations of fact. It is because of such areas of uncertainty and the fact that the workings of another human mind are quite impossible to measure with exactness, that it is necessary, in large measure, to leave the determination of what constitutes "clear and convincing" evidence to the trial judge.[4]

 It is not required that the trial judge's view of the evidence be that which the justices, or any particular justice, of this court would have taken of it. There is the practical necessity of making allowance for his advantaged position and indulging some latitude for his personal reactions and reasoning with respect thereto, even though they may not fit the exact pattern of our own. In reviewing the appraisal he makes we can only apply the standard of reasonableness, as it appears to us: this entails application of a rule that is admittedly, but necessarily, not as precise as might be desired: if the evidence in favor of his finding appears to be such that reasonable minds acting fairly, reasonably and in good conscience could regard it as being clear and convincing, as the ordinary meaning of those words imply, the finding should not be disturbed. Inasmuch as the burden rests upon the defendants to demonstrate that the trial court was in error, the findings and judgment should not be disturbed unless we can say affirmatively, and with some degree of assurance, that there is no reasonable basis in the evidence upon which he could fairly and rationally have thought that the requisite degree of proof, i. e., by clear and convincing evidence, was met.

 We direct attention briefly to the salient points of plaintiff's evidence and theory of the case in the light of the above discussion. The fundamental consideration is that there is nothing incredible or unnatural about Harry Child's contention that inasmuch as he conceived the idea of acquiring this property and nourished it for several years, finally overcoming the obstacles encountered in getting it, he did not agree to forego all interest in it himself and purchase it for Eugene. The fact that Hazel and Eugene testified one way as to the arrangement concerning the purchase of the property, and that Harry alone testified to the contrary is not controlling. Determining the weight of the evidence is not merely a process of counting noses. Under the trial court's prerogative of determining the credibility of the witnesses he could disbelieve Hazel and Eugene and believe Harry where their testimony was in conflict.

 The things Eugene did with respect to the property are subject to rational explanation consistent with plaintiff's the-

4. See Greener v. Greener, 116 Utah 571, 212 P.2d 194; Northcrest, Inc., v. Walker Bank & Trust Co., 122 Utah 268, 248 P.2d 692, 698.

ory. This is so because in the light of human experience the trial court could have taken the view that Harry Child indulged considerable tolerance toward his son, and should not be compelled to resort to law against him or be deemed to lose the ownership of his land. It is our conclusion that the trial court's view that the evidence is clear and convincing in favor of plaintiff's position is not unreasonable to the extent that we should upset the judgment.

Upon the basis of the facts as found, equity and good conscience would not permit one in Eugene's position to reap the benefits of his father's foresight, planning and efforts simply because his father placed title in him to assure him that his loan would be repaid. It was to avoid any such injustice that the device of resulting trust had its origin.[5] Under the agreement as determined by the trial court a trust resulted in favor of plaintiff Harry Child.

As a necessary incident to the transaction equity imposes upon Harry Child, and upon the property, the obligation to repay Eugene his money. Inasmuch as there was no express agreement as to the interest, it carries the legal rate of interest from the date it was borrowed until repaid.

A subsidiary question concerns the admission of evidence. Harry Child testified that his wife, Hazel, had previously told him that she was authorized by Eugene to lend Harry money provided title be taken in Eugene's name. It is urged that as this is an out of court declaration offered to prove the truth of the matter asserted, it is hearsay and therefore incompetent. We are not obliged to concern ourselves to what extent Hazel Child was acting for Eugene in the transaction by being left control of the money and delivering it to Harry as she did, nor whether she could commit Eugene in regard to such loan. Whatever merit there may have been to this objection, the defendant is now precluded from voicing it. The testimony was elicited without objection. This constituted a waiver of the right to question its competency.[6] And the evidence being so received could be relied upon as proof of the fact to which it related.[7]

Defendants make the further argument that even in the event of a resulting trust, the plaintiff's claim is barred by the four-year statute of limitations[8] and by laches. These defenses are, as a general rule, not available to a trustee against a beneficiary while the latter is in possession of the property;[9] nor until the trus-

5. See 3 Scott, Trusts, § 448 (1st Ed. 1939).
6. McCormick, Evidence, Sec. 52 (1st Ed. 1954).
7. Id. at Sec. 54.
8. U.C.A.1953, Sec. 78–12–25.
9. Gilbert v. Sleeper, 71 Cal. 290, 12 P. 172.

tee definitely repudiates the trust and this is made plain to the beneficiary. The very nature and purpose of a resulting trust militates against the application of laches;[10] more particularly so because it is not generally applied strictly between near relatives for reasons touched on above in this opinion.[11]

In regard to the defendant's contention that laches should bar the plaintiff after so long delay in seeking relief because it would now work a hardship and inequity upon them, in addition to what has heretofore been said, this is to be observed: the defendants have actually done nothing to improve the property except to pay some of the taxes for the father, which can be reimbursed. Reconveyance by them now would work no greater hardship on them than it would have done 10 years ago, except as to the natural increment in the value of the property. That simply inured to the benefit of whoever owned it, and without effort or expenditure on the part of anyone. It does not represent a change wrought by the efforts of the defendants and they did not in any way alter their position for the worse because of the delay in bringing the action against them. On the other hand, the basic equities with respect to the only substantial change in sight, the increase in value, run strongly in favor of plaintiff, Harry Child, who conceived the idea of acquiring the property and successfully carried through the plan to get it. The trial court was undoubtedly impressed, as are we, with the idea that it would be unfair to apply laches, which is a doctrine of equity, to deprive the plaintiff of the benefits of his planning and efforts. He who plants the crop should reap the harvest.

By reason of the determination of the major issue as hereinabove set forth, the other portions of the judgment relating to damages for the sale of the one-half acre and the removal of the topsoil fall into place as correct.

Affirmed. Costs to respondent (plaintiff).

McDONOUGH, C. J., and WORTHEN, J., concur.

HENRIOD, J., concurs in result.

WADE, Justice

I concur.

However, I have grave doubts that the evidence is clear and convincing that the deed to Eugene was intended as a mortgage. This is a field in which different minds in many cases violently disagree. There are no standards by which this question can be definitely determined. The only standard which aids the court in determining this question is whether the finding that the evidence is clear and convinc-

---

10. Ibid.

11. Rottman v. Rottman, 55 Cal.App. 624, 204 P. 46.

272

ing is reasonable in view of all the evidence. Such standard is very indefinite, for a finding which is reasonable to one person is often unreasonable to others.

In this case what seems reasonable to the trial judge and a majority of the court does not seem so reasonable to me. From a reading of the evidence it seems to me more probable that this property was purchased for Eugene than for his father. There are a lot of undisputed circumstances which, to me, so indicate. However, since the trial judge, who saw and heard the witnesses, and a majority of this court agree that this evidence is clear and convincing, I concur with the main opinion in its treatment of the quantum of proof required.