2006 UT App 78

Jeanne TOLLE, Plaintiff and Appellee,

v.

Mary Dagmar FENLEY, John Fenley, Ralph Eugene Tolle, Juan H. Hernandez, and Sherry A. Hernandez, Defendants and Appellants.

No. 20041045–CA.

Court of Appeals of Utah.

March 2, 2006.

Jared Coleman, Law Office of Jared G. Coleman, Salt Lake City, for Appellants.

Kenneth Parkinson and Ryan D. Tenney, Howard Lewis & Petersen, Provo, for Appellee.

Before Judges BENCH, McHUGH, and THORNE.

## OPINION

BENCH, Presiding Judge:

¶ 1 Appellants Mary Dagmar Fenley and John Fenley (collectively, the Fenleys) assert

that the trial court erroneously voided the transfer of real properties from Robert Tolle under the Utah Uniform Fraudulent Transfer Act (UFTA). *See* Utah Code Ann. §§ 25–6–1 to –13 (1998). We affirm.

## BACKGROUND

¶ 2 Appellee Jeanne Tolle was born in Ohio in 1958 to Robert and Wilma Tolle. Approximately one year later, the family moved to Florida. During Jeanne's childhood and adolescence, Robert raped and abused her on numerous occasions. Later, Robert and Wilma divorced. Jeanne reported the rape incidents to the Florida police in 1973, and Robert returned to Ohio. From 1973 to 2001, Jeanne was unable to locate Robert because his exact whereabouts were unknown to her.

¶ 3 In 1987, Robert married Mary Dagmar Fenley in Utah. The couple amicably divorced in 2001. Later that year, Jeanne's cousin gave her Robert's phone number and told her that Robert had been living in Utah for the previous fourteen years. In the process of discovering her father's address, Jeanne contacted Ralph Tolle, Robert's brother, and Mary, Robert's ex-wife. Jeanne told them both about her past abuse and rape incidents and informed them that she had three goals: first, to make sure no other children were hurt by Robert; second, to make sure Robert went to prison for raping and abusing her; and third, to take away Robert's possessions for what he did to her. Jeanne then contacted a Florida police detective. The detective instructed her to telephone Robert to see if he would acknowledge the rape incidents and asked her to record the conversation.

¶ 4 In October 2001, Jeanne called Robert. During the conversation, Robert acknowledged that he had raped her on several occasions. He told her that he was sorry. Robert also told Jeanne that he owned a two-hundred acre ranch and a five-bedroom house in Utah and invited her to come to

visit him.[1] Jeanne accepted the invitation to visit and came to Utah in November 2001. During the visit, Robert put Jeanne's name on several of his bank accounts. After the Thanksgiving holiday, she returned to Florida.

¶ 5 On November 30, 2001, Robert was arrested in Utah. At the time of his arrest, Robert telephoned Jeanne and "told her that he was being arrested and that he knew she was responsible" for his arrest. The next day Jeanne flew to Utah. While in Utah, Jeanne withdrew all of the money in the joint bank accounts. Jeanne also met with Juan and Sherry Hernandez, Robert's friends and caretakers, and told them her three goals.

¶ 6 Following Robert's incarceration, several of the Defendants wrote letters to Robert "indicating an interest in protecting [his] property from Jeanne."[2] Five days after his arrest, Robert asked Ralph to "pick[ ] up quit-claim deeds on the way" to the jail "for Robert's signature." Robert signed and deeded all of his real properties to Ralph and Mary, as joint tenants. The trial court later found that this "made [Robert] insolvent by virtue of the transfer."

¶ 7 Robert was extradited from Utah and indicted in Florida. In February 2002, Jeanne filed a civil action against Robert in Florida, which ultimately resulted in a default judgment in the amount of $1,704,610.75, plus interest. While awaiting his criminal trial, Robert died in Florida in June 2002.

¶ 8 Ralph later signed a quit-claim deed to Juan and Sherry Hernandez, as joint tenants, for part of his interests in the properties previously deeded to him by Robert. The Hernandezes paid Ralph nothing for the deed. Mary also signed a quit-claim deed to establish joint ownership with her son, John Fenley, for all of her interests in the properties previously deeded to her by Robert. John paid nothing to Mary for this transfer.

---

1. In fact, Robert owned several properties in Utah.

2. Ralph wrote a letter to Robert advising him about the "best way to keep Jeanne from having access to [Robert's] assets." Sherry wrote to Robert, urging him to write her a letter giving her permission to keep Robert's most valuable items "so Jeanne could not get them." Mary wrote a letter to Robert, informing him that she felt that Jeanne was trying to "get Robert's money and property."

¶ 9 In March 2003, Jeanne filed a complaint against all of the Defendants seeking to void the alleged fraudulent transfer of properties from Robert to the Defendants, pursuant to the UFTA. *See* Utah Code Ann. § 25–6–1 to –13. The trial court found that Jeanne's "right to payment" or claim "arose before any transfer of the land from Robert Tolle." The court specifically found that although "Plaintiff, Jeanne Tolle, did not file civil suit until February, 2002 in Florida and procure a judgment until September 24, 2004, the Plaintiff made her intentions clear to Robert Tolle and the other defendants prior to any transfers." Additionally, the trial court found that the Defendants did not give any consideration for the transfers and concluded that "[t]he transfer of all the … property was a fraudulent transfer made with the intent to keep the property from the reach of the Plaintiff, Jeanne Tolle's judgment" and is "therefore void." The Fenleys now appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 10 The Fenleys present several issues on appeal. First, the Fenleys assert that the trial court erroneously concluded that Jeanne was a "creditor" and that she had a "claim" to the transferred properties under the UFTA. Second, the Fenleys assert that the trial court erroneously concluded that Robert had "actual intent" to fraudulently transfer the properties under Utah Code section 25–6–5(1)(a) of the UFTA. Utah Code Ann. § 25–6–5(1)(a). Third, the Fenleys assert that the trial court erroneously concluded that Robert was "insolvent" under the UFTA at the time the properties were transferred. *Id.* §§ 25–6–3, –6(2).

¶ 11 These issues present mixed questions of fact and law. We review factual questions under the clearly erroneous standard and legal questions under the correctness standard. *See Jeffs v. Stubbs*, 970 P.2d 1234, 1244 (Utah 1998). Although questions of law are reviewed for correctness, we "may still grant a trial court discretion in its application of the law to a given fact situation." *Id.* Questions of statutory interpretation are questions of law that are reviewed for correctness and no deference is given to the

trial court's determination. *See Department of Pub. Safety v. Robot Aided Mfg. Ctr., Inc.*, 2005 UT App 199, ¶ 6, 113 P.3d 1014.

## ANALYSIS

### I. "Creditor" under the UFTA

¶ 12 The Fenleys first argue that the trial court erred by incorrectly classifying Jeanne as a creditor under the UFTA because she initially only threatened civil action and did not obtain a judgment until after Robert transferred his properties to Mary and Ralph. *See* Utah Code Ann. § 25–6–2(3), (4).

¶ 13 For the UFTA to apply, the statute requires a "creditor-debtor relationship." *Bradford v. Bradford*, 1999 UT App 373, ¶ 14, 993 P.2d 887. The UFTA provides a remedy against debtors who seek to "defraud a creditor or avoid a debt." *Id.* "[T]ransfers of property designed to place a debtor's assets beyond the reach of the debtor's creditors are void as to the creditors." *National Loan Investors, L.P. v. Givens*, 952 P.2d 1067, 1069 (Utah 1998) (citation and quotations omitted). Because the UFTA "is remedial in nature," the Utah Supreme Court has held that the statute "should be liberally construed." *Id.* The UFTA "broadly defines the word 'creditor' to mean any person who has a claim." *Id.* (citing Utah Code Ann. § 25–6–2(4)). A "claim" is also broadly defined under the UFTA as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Utah Code Ann. § 25–6–2(3).

¶ 14 Based on the broad definition of a claim under the UFTA and the direction from our supreme court to construe the statute liberally, we hold that Jeanne was "indeed, a creditor of [Robert], given that [her] claim to the [properties]—although not reduced to judgment [at the time]—had arisen through recent threats [of civil action]." *Bradford*, 1999 UT App 373 at ¶ 16, 993 P.2d 887. Jeanne's numerous threats of suit and Robert's awareness of probable legal action against him amount to a "claim" for purposes of the UFTA. *See United States v. Green*,

201 F.3d 251, 257 (3d Cir.2000) (citing *Baker v. Geist*, 457 Pa. 73, 321 A.2d 634 (1974), for the holding that mere "awareness of a probable legal action against a debtor amounts to a debt" for purposes of the Pennsylvania Uniform Fraudulent Conveyances Act); *Bradford*, 1999 UT App 373 at ¶ 16, 993 P.2d 887; 37 Am.Jur.2d *Fraudulent Conveyances and Transfers* § 3 (2001) ("The existence of a debt is a requirement for bringing a fraudulent conveyance action and generally speaking, the awareness of probable legal action against a debtor amounts to a 'debt.'" (footnotes omitted)). The trial court found that "[w]hile the Plaintiff, Jeanne Tolle, did not file civil suit until February, 2002 in Florida and procure a judgment until September 24, 2004, the Plaintiff made her intentions clear to Robert Tolle and the other defendants prior to any transfers." For purposes of the UFTA, Jeanne is therefore a creditor whose claim arose before Robert transferred the properties.

¶ 15 The Fenleys also argue that Jeanne's Florida judgment does not qualify as a claim under the UFTA because it allegedly was sought in violation of Florida's statute of limitations and obtained through the collusion of her half-sister.[3] These arguments constitute collateral attacks on the Florida judgment. "The general rule of law is that a judgment may not be drawn in question in a collateral proceeding and an attack upon a judgment is regarded as collateral if made when the judgment is offered as the basis of a claim in a subsequent proceeding." *Olsen v. Board of Educ.*, 571 P.2d 1336, 1338 (Utah 1977). As a result, we do not consider these collateral attacks.

¶ 16 In his separate concurring opinion in this matter, Judge Thorne argues that, as a matter of uniformity, we should adopt Arizona's approach. *See Hullett v. Cousin*, 204 Ariz. 292, 63 P.3d 1029 (2003). The concurring opinion cites *Hullett* for the proposition that a statute of limitations argument should not be considered a collateral attack on a previously entered judgment for purposes of

the UFTA because "solvency is determined at the time of the transfer," not at the time of the judgment. *Id.* at 1034.

¶ 17 We cannot adopt the Arizona approach in our case because the Full Faith and Credit Clause of the United States Constitution prevents us from reviewing the judgments of foreign states with proper adjudicatory authority, even if a foreign state has misinterpreted its own law. *See* U.S. Const. art. IV, § 1.[4] Controlling precedent from the United States Supreme Court has differentiated between "the credit owed to laws (legislative measures and common law) and [the credit owed] to judgments." *Baker v. GMC*, 522 U.S. 222, 232, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). *"Regarding judgments*, however, *the full faith and credit obligation is exacting.* A final judgment in one State ... qualifies for recognition throughout the land.... [I]n other words, the judgment of the rendering State gains nationwide force." *Id.* at 233, 118 S.Ct. 657 (emphasis added). The Supreme Court has stated that it is "'aware of [no] considerations of local policy or law which could rightly be deemed to impair the force and effect which the full faith and credit clause and the Act of Congress require to be given to [a money] judgment outside the state of its rendition.'" *Id.* at 234, 118 S.Ct. 657 (alterations in original) (quoting *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 438, 64 S.Ct. 208, 88 L.Ed. 149 (1943)).

¶ 18 Whether a statute of limitations has run is a legal conclusion. *See Estes v. Tibbs*, 1999 UT 52, ¶ 4, 979 P.2d 823. In challenging such a determination, the challenging party's *"only recourse* is to assert these legal arguments *on direct review* ...; it cannot raise these contentions in a collateral attack on the judgment." *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 710 n. 16, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982) (emphasis added). It is therefore not within the purview of the Utah

---

3. The Florida judgment was entered by default. Jeanne's half-sister served as the personal representative of Robert's estate. No appeal was taken from that judgment and it is now final.

4. Although the Florida default judgment was entered after the transfer, it precludes further speculation by this court about the validity of a hypothetical statute of limitations defense.

courts to review the final judgment of a sister state.

¶ 19 It is important to note that *Hullett* is an Arizona case that addresses the viability of an Arizona default judgment. After setting forth its rationale, the Arizona Supreme Court remanded the case to the Arizona trial court to ascertain when the underlying claim accrued. *See Hullett*, 63 P.3d at 1035. Conversely, in our case, we are dealing with a Florida judgment. Not only does the Full Faith and Credit Clause require us to recognize the judgment, but we have no option in our case to remand the case to Florida for further proceedings. As a result, although the Arizona Supreme Court in *Hullett* was able to delve into and attack a default judgment entered in its own lower court, we are not at liberty to do so in this matter. Therefore, we cannot adopt the concurring opinion's approach here.

## II. Fraudulent Transfer

¶ 20 Under the UFTA, there are two distinct avenues under which a claim for a fraudulent transfer may be asserted: (1) if the creditor's claim arose *before or after* the transfer, pursuant to Utah Code section 25–6–5, or (2) if the creditor's claim arose *before* the transfer, pursuant to Utah Code section 25–6–6. *See* Utah Code Ann. §§ 25–6–5, –6. Section 25–6–5 provides that the debtor's actual intent may be determinative in establishing whether a transfer is fraudulent under the UFTA. *See id.* § 25–6–5. Under section 25–6–6, the debtor's actual intent is irrelevant and the focus is on whether the debtor received "reasonably equivalent value" for the transferred properties and whether the debtor is "insolvent at the time or became insolvent as a result of the transfer." *Id.* § 25–6–6.

¶ 21 The trial court discussed the elements of both avenues and found that Robert had actual intent to fraudulently transfer properties pursuant to section 25–6–5. *See id.* § 25–6–5. The court also found that "[e]ven without considering Robert Tolle's intent, the transfer of the ... property was fraudulent" pursuant to section 25–6–6 because it rendered Robert insolvent and he did not re-

ceive reasonably equivalent value for the properties. *See id.* § 25–6–6.

### A. Utah Code section 25–6–6

¶ 22 The debtor's insolvency and evidence that reasonably equivalent value was not exchanged for the properties are necessary to establish a fraudulent transfer under section 25–6–6. Utah Code Ann. § 25–6–6. Under this section, Robert's actual intent is not relevant to the question of fraudulent transfer, which the Fenleys concede in their brief. Section 25–6–6 states:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

(a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(b) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

*Id.*

¶ 23 A finding of "insolvency" is necessary before a fraudulent transfer can be established under section 25–6–6(1)(b) of the UFTA. *Id.* § 25–6–6(1)(b). A transfer by the debtor is fraudulent if, inter alia, "the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation." *Id.* The Fenleys argue that "[t]he fact that [Robert] had no assets did not, in itself[,] make him insolvent ... because [Robert] needed no assets in his circumstances.... He had no creditors nor obligations and his physical needs were being met, if meagerly, by the facility in which he was incarcerated." The Fenleys, therefore, argue that Robert was solvent and that the UFTA does not apply. We disagree.

¶ 24 Under the UFTA, "[t]he level of insolvency necessary to meet the statute

requirement is not insolvency in the bankruptcy sense but merely a showing that *the party's assets are not sufficient to meet liabilities as they become due.*" *Meyer v. General Am. Corp.*, 569 P.2d 1094, 1096 (Utah 1977) (emphasis added). In order to prove insolvency, a "balancing of assets and liabilities must be accomplished" and "[o]nly a showing that the debtor's entire nonexempt property and assets are insufficient to pay his debts rises to the level of insolvency." *Furniture Mfrs. Sales, Inc. v. Deamer*, 680 P.2d 398, 400 (Utah 1984) (footnotes omitted).

¶ 25 The trial court properly made this determination. As Robert transferred "all the property ... held in [his] name" and as "the transfer consisted of all or substantially all of [Robert's] assets," any moderate debt or liability would result in Robert's insolvency. Jeanne's civil action in Florida resulted in an actual judgment of $1,704,610.75, plus interest. This debt alone, although not reduced to judgment until later, is a claim under section 25-6-2(3) that rendered Robert insolvent for purposes of section 25-6-6(1)(b) of the UFTA. *See* Utah Code Ann. §§ 25-6-2(3), -6(1)(b). As a result of the properties transferred to Mary and Ralph, Robert was rendered an insolvent debtor.

¶ 26 Therefore, as no reasonably equivalent value was exchanged for the properties and Robert was insolvent, the court's finding that Robert fraudulently transferred properties under section 25-6-6 is dispositive.

### B. Utah Code section 25-6-5

¶ 27 Even if it could be said that Jeanne's claim arose *after* Robert's transfer of properties, the transfer would still constitute a fraudulent transfer under section 25-6-5. *See* Utah Code Ann. § 25-6-5. This section establishes that a fraudulent transfer exists whether "the creditor's claim arose *before or after the transfer was made* or the obligation was incurred." *Id.* (emphasis added). Section 25-6-5 provides that a transfer is fraudulent "if the debtor made the transfer or incurred the obligation ... *with actual intent to hinder, delay, or defraud any creditor of the debtor.*" *Id.* (emphasis added). Insolvency of the debtor, under this section, is not determinative and is only one of many factors for establishing actual intent. Section 25-6-5(2) further states that:

> To determine "actual intent" ..., consideration may be given, among other factors, to whether:
>
> (a) the transfer or obligation was to an insider;
>
> (b) the debtor retained possession or control of the property transferred after the transfer;
>
> . . .
>
> (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (e) the transfer was of substantially all the debtor's assets;
>
> . . .
>
> (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; [and]
>
> (j) the transfer occurred shortly before or shortly after a substantial debt was incurred;

*Id.* § 25-6-5(2). Furthermore, actual fraudulent intent may be "inferred [by] the presence of certain indicia of fraud or 'badges of fraud.'" *Dahnken, Inc. v. Wilmarth*, 726 P.2d 420, 423 (Utah 1986) (citation omitted). These "badges of fraud" from which actual intent may be inferred, include, inter alia, a debtor "(1) continuing in possession and evidencing the perquisites of property ownership after having formally conveyed all his interest in the property, (2) making a conveyance in anticipation of litigation, and (3) making a conveyance to a family member without receiving fair consideration." *Id.*

¶ 28 The Fenleys argue that the evidence is insufficient for a finding of actual fraudulent intent under section 25-6-5. We disagree. The trial court found that Robert's transfers included all of the badges of fraud indicated above and that the transfers constituted several of the factors for determining

actual fraudulent intent under section 25–6–5(2).[5] The trial court specifically found that:

> Actual intent could be inferred from the facts that the transfer was to insiders under the statute, [that] Robert retained control over the property after the transfer, [that] Robert had been threatened with suit prior to the transfer, [that] the transfer consisted of all or substantially all of [his] assets, and [that] there was no consideration [given or received] for the transfer.

¶ 29 In reviewing the record, we agree with the trial court's determination that Robert had actual fraudulent intent to transfer properties. Thus, regardless of whether Jeanne's claim arose "before or after the transfer was made," Robert's transfer of properties also constitutes a fraudulent conveyance under section 25–6–5 of the UFTA. *Id.* § 25–6–5.

## CONCLUSION

¶ 30 For purposes of the UFTA, Jeanne was a creditor who had a claim to the properties Robert transferred to Mary and Ralph. Robert's transfer of properties constitutes a fraudulent transfer under both Utah Code sections 25–6–5 and 25–6–6. *See* Utah Code Ann. §§ 25–6–5, –6. As a result, the trial court properly voided the transfers.

¶ 31 Accordingly, we affirm.

¶ 32 I CONCUR: CAROLYN B. McHUGH, Judge.

THORNE, Judge (concurring in the result):

¶ 33 I disagree with several of the legal conclusions reached and applied by my colleagues. Specifically, I disagree with the majority's decision that a challenge to Jeanne Tolle's (Tolle) creditor status in relation to

---

5. The Fenleys argue that they are not "insiders" as set forth in section 25–6–5(2)(a), *see* Utah Code Ann. § 25–6–5(2)(a), because they are not relatives of Robert. As this is only one of several factors for determining actual fraudulent intent, even if the Fenleys are not "insiders," the evidence was sufficient for the trial court to find actual fraudulent intent.

1. As a tangential matter, I also note that the trial court found that Tolle filed her Florida lawsuit in

Robert Tolle's (Father) 2001 transfers represents a collateral attack on Tolle's 2004 Florida judgment. I also disagree that threats of litigation alone will establish creditor status in the tort context. Rather, I would prefer a rule that creditor status based on an unrealized tort claim begins with the accrual of the cause of action and continues as long as the tort claim is valid and enforceable. I would also hold that such creditor status terminates when the tort claim becomes time-barred, and is not resurrected even if a judgment on the tort is subsequently obtained through waiver or default.[1]

¶ 34 This analysis is consistent with existing caselaw from other states, and I would adopt the reasoning of those cases as we develop Utah law in this area. I also believe that, had the Fenleys properly raised these issues with the court below, they may have been able to establish that Tolle was not Father's creditor in 2001 because her 1973 tort claim had expired and was time-barred under Florida law. Such a finding would likely have rendered Father's transfers not violative of UFTA. *See* Utah Code Ann. §§ 25–6–5 to –6 (1998).

¶ 35 Nevertheless, I write in concurrence rather than dissent because I do not believe that these issues were presented to the trial court, and accordingly they were not preserved for review.

### I. Creditor Status Arising from Tort Claims

¶ 36 The majority opinion affirms the trial court's determination that Father's insolvency and intent at the time of the transfers rendered those transfers fraudulent as to Tolle. *See* Utah Code Ann. §§ 25–6–5(1)(a), 25–6–6(1)(b). Under UFTA, insolvency only renders a transfer fraudulent as to a creditor

---

February 2002. The parties do not contest this finding and the majority opinion adopts it as fact. The actual filing date of the lawsuit appears to have been February 2003, a conclusion I reach due to the case's "03" case number and the fact that it references Father's June 2002 death. I do not see how this apparent error affects either my analysis or the majority's, and I mention it solely in the interest of accuracy.

if that creditor has an existing claim at the time of the transfer. *See id.* § 25–6–6(1) (applying only to creditors "whose claim arose before the transfer was made"). For the reasons articulated later in this opinion, I also believe that actual intent to defraud under section 26–6–5(1)(a) must be directed at one who is a creditor of the grantor at the time of the challenged transfer. Accordingly, the burden is on the UFTA plaintiff to prove appropriate and timely creditor status under whatever theory of relief she employs, and a UFTA defendant may challenge any required creditor status as an avenue of defending the suit.

### A. Fenleys' Argument Not an Attack on Florida Judgment

¶ 37 The majority opinion's characterization of the Fenleys' statute of limitations argument as a collateral attack on Tolle's 2004 judgment has been rejected in circumstances similar to this case. In *Hullett v. Cousin*, 204 Ariz. 292, 63 P.3d 1029 (2003), the court rejected an argument that a challenge to creditor status at the time of a transfer represented a collateral attack on the judgment that the creditor was seeking to enforce under Arizona's version of UFTA. The court rejected this argument because "solvency is determined at the time of the transfer," not at the time of the judgment. *Id.* at 1034. Utah Code section 25–6–12 directs that Utah's UFTA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." Utah Code Ann. § 25–6–12 (1998). Pursuant to Utah Code section 25–6–12, I believe that we should follow Arizona's rejection of the collateral attack argument in order to further UFTA's stated goal of interstate consistency.

¶ 38 Even without reliance upon *Hullett*, the Fenleys' statute of limitations argument on appeal is simply not an attack on the 2004 judgment, collateral or otherwise. The 2004 judgment is unquestionably valid against Father and his estate, and it is undisputed that Tolle can collect that judgment against any assets remaining in the estate. The question before us is whether Tolle can *augment* Father's estate by forcing reconveyance from the Fenleys.[2] Tolle invokes Utah law to do so, and it is certainly within our purview to determine whether the 2001 relationship between Tolle and Father constituted a creditor-debtor relationship under Utah's UFTA. A Utah decision on this question would not diminish the validity of the Florida judgment, and Utah could still give full faith and credit to that judgment to the extent that Tolle attempts to enforce it against existing assets of Father's estate. *See National Loan Investors, L.P. v. Givens*, 952 P.2d 1067, 1071 (Utah 1998) ("[T]he Foreign Judgment Act does not preclude any original claim that is independently available under the laws of this state. [The plaintiff] did not ask the Utah district court to enforce a judgment issued by another court. Rather, [the plaintiff] seeks to avoid transfers of property that may affect its rights as a putative judgment creditor. The Florida action is relevant *only to the extent that it evidences [the plaintiff]'s status as a putative creditor.*" (emphasis added)).

### B. Creditor Status Arises Upon Accrual of a Tort

¶ 39 Addressing the Fenleys' challenge to Tolle's 2001 creditor status requires an analysis of when Tolle's 1973 tort claim rendered her a creditor for UFTA purposes. The majority opinion holds that Tolle's creditor status began when she threatened suit against Father on the 1973 claims. However, the Utah case cited and the Oregon cases it adopts all address creditor status in the context of divorce. *See Bradford v. Bradford*, 1999 UT App 373, ¶¶ 15–16, 993 P.2d 887; *see also Adamson v. Adamson*, 273 Or. 382, 541 P.2d 460 (1975); *Weber v. Rothchild*, 15 Or. 385, 15 P. 650 (1887).[3] I believe the

---

2. Although perhaps irrelevant to the point at hand, it seems worth noting that the Fenleys are not privies to Father or his estate, were not parties to Tolle's Florida suit, and had no opportunity to litigate a statute of imitations defense in a Florida court.

3. The majority opinion also cites to *United States v. Green*, 201 F.3d 251 (3d Cir.2000) (*cited in* 37 Am.Jur.2d *Fraudulent Conveyances and Transfers* § 3 (2001)), as support for its decision that mere threats of litigation will establish debtor status even in the absence of a valid cause of action. I

more appropriate rule in cases involving a tort claim is that creditor status begins as soon as the cause of action accrues.

¶ 40 An Alabama UFTA case, *Granberry v. Johnson*, 491 So.2d 926 (Ala.1986), appears to be directly on point to this issue. *Granberry* held that "[t]he debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties." *Id.* at 928. "Hence, a tort claimant is a creditor, and the alleged tortfeasor is the debtor." *Id.; see also In re Martin*, 145 B.R. 933, 949 (Bankr.N.D.Ill.1992) (holding that liability for compensatory damages arises at time that debtor commits the tort). *Granberry* analyzes Alabama's version of UFTA, which is nearly identical to Utah's version, and as with *Hullett*, I believe that we owe *Granberry* some deference pursuant to Utah Code section 25–6–12. *See* Utah Code Ann. § 25–6–12.

¶ 41 I view the adoption of an accrual rule as expanding, rather than limiting or overruling, the notice rule expressed in *Bradford*. *See* 1999 UT App 373 at ¶ 16, 993 P.2d 887. *Bradford* and the cases cited therein dealt with creditor status between spouses based on one spouse's threat of divorce. *See id.* at ¶¶ 15–16. A cause of action for divorce might be said to accrue on the date of a marriage and continue forward so long as the marriage exists. Under a general rule that creditor status arises on the accrual of a claim, spouses would automatically be deemed creditors of each other throughout the duration of their marriage. *Bradford's* "recent threat[ ] of divorce" rule, *id.* at ¶ 16, avoided this result, wisely in my opinion, by finding that creditor status between spouses arises only upon notice that divorce litigation and its resulting property division is reasonably imminent.

¶ 42 In the tort context, an accrual rule would protect tort victims while respecting UFTA's "right to payment" requirement. For example, under a notice rule, a negligent driver might cause grave injury to another, but a transfer by the driver intended to protect assets from the resulting tort claim would be deemed inviolate so long as it preceded notice of the victim's intent to sue. An accrual rule would eliminate this loophole, and would simplify litigation by replacing the easily disputed concept of notice with a fixed date of accrual, which is more easily ascertainable in most cases. At the same time, such a rule prevents a person from being rendered a creditor merely on empty or invalid threats of litigation, but instead requires the actual existence of a valid tort claim. The validity and accrual date of the claim would be established either by direct

---

believe that the majority's quote from *Green*, a federal tax enforcement case, omits important context, and that a more complete quote actually supports my position:

> The United States is considered a creditor "from the date when the obligation to pay income taxes accrues," essentially on April 15 of the year following the tax year in question. *United States v. St. Mary*, 334 F.Supp. 799, 803 (E.D.Pa.1971). Further, the Pennsylvania Supreme Court has found that awareness of a probable legal action against a debtor amounts to a debt for purposes of determining solvency. *See Baker v. Geist*, 457 Pa. 73, 76–77, 321 A.2d 634 (1974).

*Id.* at 257. On its face, then, *Green* stands for the proposition that, at least with regard to tax liability, creditor status arises upon the accrual of the obligation to pay rather than upon any threat of litigation.

More interestingly, the two cases cited in *Green* also suggest an accrual rule rather than a notice rule. The cited Pennsylvania case clearly adopts the accrual rule in the context of tort claims:

The appellees have cited *First National Bank v. Hoffines*, 429 Pa. 109, 239 A.2d 458 (1968). *Hoffines*, however, refused to set aside a conveyance as fraudulent because the plaintiff was not a creditor at the time of the conveyance. Defendant's liability to the plaintiff arose from defendant's conduct (execution of a note) which *occurred after* the conveyance was made. In this case, appellee Geist's liability was based on her conduct (negligence in the motor vehicle collision) which *occurred before* the conveyances were made. Appellant, therefore, in this case, was a creditor at the time of the conveyances.

*Baker v. Geist*, 457 Pa. 73, 321 A.2d 634, 637 (1974). And in *United States v. St. Mary*, the court explained that application of an accrual rule to federal tax liability merely put the government in "the same position as that of a private creditor." 334 F.Supp. 799, 803 (E.D.Pa.1971) (quotations and citation omitted).

Taken together, I believe that *Green* and its cited authorities support an accrual rule rather than a notice rule.

litigation or collaterally, such as in an action under UFTA.

¶ 43 For these reasons, I would support the adoption of an accrual rule whereby UFTA creditor and debtor status accrues along with a cause of action in favor of one against another.[4]

## II. A Time–Barred Claim is Not Valid and Will Not Support Creditor Status Under UFTA

¶ 44 Applying the accrual rule to the facts of this case would not, by itself, alter the outcome, as both the trial court and the majority opinion treat Tolle's 2004 judgment as merely the reduction of her 1973 cause of action to judgment. If Tolle's 2004 judgment is merely the direct reduction of the 1973 claim, and the 1973 claim was in existence from accrual through judgment, then the trial court and majority would appear to be correct that Father's transfers violated both the insolvency and intent theories of UFTA. *See* Utah Code Ann. § 25–6–2(3) to (4) (1998) (defining a creditor as one who "has a claim," and a claim as "a right to payment, whether or not the right is reduced to judgment[, etc.]").

¶ 45 I am troubled, however, by the assumption that Tolle's 1973 cause of action existed continuously from 1973 to 2004 and rendered her a creditor at the time of the 2001 transfers merely because a default judgment ultimately resulted. I view Tolle's 2004 judgment as arising out of the 2003 default rather than Father's 1973 misdeeds, and believe that a proper analysis must address whether the 1973 claim was a "right to payment"—i.e., enforceable—*at the time of the transfers*. In this case, I believe that Tolle's 1973 claim was potentially barred as a matter of law by the applicable Florida statutes of limitation at the time of transfer. If

that is in fact the case, the Fenleys would have been entitled to invoke those statutes to challenge Tolle's creditor status as of the date her claim became time-barred.

¶ 46 In a UFTA action, a plaintiff is entitled to relief only if she can establish creditor status in several respects. The UFTA plaintiff herself must have some current claim against the grantor, *see* Utah Code Ann. §§ 25–6–5 to –6, as it is only the need to satisfy that claim that justifies revesting the property in the grantor. *See Laidley v. Heigho*, 326 F.2d 592, 594 (9th Cir.1963) (stating that "the statute does not contemplate the absurdity of granting [reconveyance] where, as here, judgment cannot be obtained against the only party in whom the transferred property could be revested"). If the plaintiff has no currently enforceable claim, she cannot obtain creditor's relief under UFTA. *See* Utah Code Ann. §§ 25–6–5 to –6; *see also Laidley*, 326 F.2d 592 at 594; *State of Rio De Janeiro v. E.H. Rollins & Sons, Inc.*, 299 N.Y. 363, 87 N.E.2d 299, 300 (1949) (stating that "after B had failed, within the fixed six-year time, to sue on his contract, he was thereafter no creditor of A, at all, and had no right or position as to contesting his former debtor's act of divesting himself of his assets"); *Jahner v. Jacob*, 515 N.W.2d 183, 185 (N.D.1994) (stating that "claimant loses her status as a creditor if her claim against the transferor becomes barred by the statute of limitations, a non-claim statute, or other method"). *But see Goldberg, Bowen & Co. v. Demick*, 77 Cal.App. 535, 247 P. 261, 263–64 (1926) (holding that statute of limitations defense is personal to the debtor and may not be asserted by transferee in a fraudulent conveyance action).

¶ 47 When a UFTA plaintiff seeks to force reconveyance on an insolvency theory, she must also establish that the claim she seeks to satisfy arose prior to, and remained con-

---

4. But note that two other Utah cases touch on this issue, and both seem to suggest, without directly holding, that the proper date for accrual of creditor status is the filing of a lawsuit. *See McGoldrick v. Walker*, 838 P.2d 1139, 1141 & n. 1 (Utah 1992) (applying "existing or subsequent creditors" language of prior Utah Uniform Fraudulent Conveyances Act and suggesting that filing of lawsuit, rather than mere existence of promissory note, triggers "existing" creditor sta-

tus); *Zuniga v. Evans*, 87 Utah 198, 48 P.2d 513, 516 (1935) (finding that prior act's definition of creditor was satisfied during pendency of tort litigation even prior to judgment).

For the reasons expressed in the text, as well as the broad language of UFTA and the reasoning in *Granberry v. Johnson*, 491 So.2d 926, 928 (Ala.1986), I would still hold that creditor status accrues simultaneously with a cause of action.

tinuously valid until, the date of the challenged transfer. *See* Utah Code Ann. § 25–6–5. The Arizona Supreme Court, applying Arizona's UFTA, recently concluded that a claim that is time-barred at the date of the transfer is not a valid claim and cannot be used to establish the grantor's insolvency at the time of the transfer. *See Hullett v. Cousin*, 204 Ariz. 292, 63 P.3d 1029, 1030 (2003) (determining that a claim "must be disregarded if found to be time-barred at the time of the transfer").[5] The same analysis would similarly preclude recovery under Utah Code section 25–6–6, which requires that the claim that the plaintiff is attempting to satisfy actually pre-date the challenged transfer.

¶ 48 Finally, a UFTA plaintiff proceeding on an "actual intent" theory under Utah Code section 25–6–5(1)(a) must establish that the defendant transferred property with actual intent to "hinder, delay, or defraud *any creditor* of the debtor." Utah Code Ann. § 25–6–5(1)(a) (emphasis added). A UFTA plaintiff need not show that the defendant intended to defeat her claim in particular, and indeed her claim need not even have existed at the time of the defendant's transfer. *See id.* Nevertheless, at the time of the defendant's transfer, the defendant must have intended to defraud an existing creditor, i.e., someone who had a "right to payment" at the time of the transfer. *Id.* § 25–6–2(3) to (4) (defining "creditor").[6] Again, *Hullett's* analysis that a time-barred claim is not a claim under UFTA and will not support UFTA creditor status indicates to me that a person's actual intent to place assets beyond the reach of an accuser will not render a transaction fraudulent if the accuser's claim is a legal nullity at the time of the transfer.

¶ 49 In *Hullett*, the plaintiff challenged a partnership's (Suncrest) distribution of assets at its 1994 dissolution, alleging that he had claims against Suncrest at the time of dissolution, that Suncrest knew of those claims, and that Suncrest was either actually insolvent or rendered insolvent by his claims.

---

5. The quotation in this citation refers to a claim described by the court as "unknown, unasserted, and presumably time-barred." *Hullett v. Cousin*, 204 Ariz. 292, 63 P.3d 1029, 1030 (2003). The court's subsequent analysis, however, relies solely on the time bar issue to reach its holding. *See id.* at 1032–35.

6. I am aware that UFTA is to be construed liberally to effectuate its purpose of remediating fraudulent behavior towards creditors. *See Macris & Assocs., Inc. v. Neways, Inc.*, 2002 UT App 406, ¶ 16, 60 P.3d 1176. To that end, there are at least two ways that one could read Utah Code section 25–6–5 to encompass transfers made with the intent to defraud one who is not a creditor at the time of the transfer. However, neither of these interpretations is tenable in my opinion.

First, one could read "any creditor" in section 26–6–5(1)(a) to be determined solely by the grantor's subjective belief. Under this interpretation, if a grantor believes he is defrauding a creditor by making a transfer, then the transfer is fraudulent as to all future creditors solely because of the grantor's bad intent. This approach appears to have been previously rejected by this court in *Brockbank v. Brockbank*, where we determined that even actual fraudulent intent will not render a transfer voidable if the transfer does not otherwise fall within UFTA's purview. *See* 2001 UT App 251, ¶¶ 11–15, 32 P.3d 990 ("We thus conclude [that UFTA] is not applicable to James's transfer of his right of redemption to Cheryl, *notwithstanding any actual, subjective intent* of James 'to hinder, delay, or defraud' Penny." (emphasis added) (quoting Utah Code Ann. § 25–6–5(1)(a))).

One could also interpret the "any creditor" language of section 25–6–5(1)(a) to mean any past, present, or future creditor. Such an interpretation is facially appealing, particularly in light of the legislature's use of the modifier "any" and the clause "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred." Utah Code Ann. § 25–6–5(1)(a). Nevertheless, I believe that a reading of the statute as a whole precludes such an interpretation.

The "before or after" clause in section 25–6–5(1) clearly applies only to the particular claim that the UFTA plaintiff is attempting to collect through her UFTA action, not to the claim or claims creating the "any creditor" status required to establish intent under subsection (1)(a). Moreover, the legislature's inclusion of the "before or after" language in 25–6–5(1) indicates that, without such modifying language, the term creditor means one who *has* a claim, rather than one who *has or will have* a claim. *See* Utah Code Ann. § 25–6–2(4). Using the proper, present-tense definition of "creditor," a transfer is fraudulent under section 25–6–5(1)(a) only if the grantor's intent is to hinder, delay, or defraud an existing creditor, i.e., someone who has a claim or right to payment at the time of the transfer. Accordingly, I would hold that mere intent to defraud one who once had a claim, or who will have a claim in the future, does not render a transfer fraudulent under section 25–6–5(1)(a).

*See* 63 P.3d at 1031. The plaintiff had sued Suncrest on his 1989 negligent misrepresentation claims in 1995, and obtained a default judgment in 1996. *See id.* In 1998, the plaintiff sued Suncrest under Arizona's version of UFTA to recover assets distributed by Suncrest at dissolution. *See id.* The trial court granted summary judgment in favor of Suncrest due to a lack of evidence of intent to defraud, bad faith, or insolvency, and because the plaintiff failed to raise his claims with Suncrest until after the distribution. *See id.* An intermediate appeals court reversed the trial court, reasoning that a claim existing at the time of dissolution can render a partnership insolvent whether the claim has been asserted or not. *See id.*

¶ 50 The Arizona Supreme Court granted review "to examine whether an unknown and presumably time-barred claim must be considered in determining if a partnership was insolvent when it transferred its assets to its limited partners." *Id.* at 1032. The court determined that Suncrest's knowledge of the claim was irrelevant under a UFTA insolvency analysis, *see id.* at 1033, and proceeded to address the time bar issue in some detail. The court stated:

> Two principles inform our answer to the core question. First, to set aside a transfer as fraudulent, there must have been a valid claim at the time of the transfer, meaning a right to payment. Second, whether a claim rendered the partnership insolvent is determined as of the date of the transfer, or in this case, the date the partnership dissolved.

*Id.* at 1033–34 (citations omitted). Applying these principles, the court determined "a claim that is time-barred is not a 'right to payment,'" and as such does not constitute a "claim" under Arizona's UFTA. *Id.* at 1034 (citation omitted). The court remanded the matter for further factual development to determine whether the plaintiff's 1989 claim was in fact time-barred at the time of the 1994 dissolution. *See id.* at 1035.

¶ 51 Given UFTA's interstate uniformity provision, *see* Utah Code Ann. § 25–6–12, I believe that we should follow *Hullett* and hold that a time-barred cause of action is not a claim under UFTA, that a tort claimant loses UFTA creditor status when her tort claim becomes time-barred, and that an alleged claim must be disregarded for purposes of rendering a transfer fraudulent if it is established to have been time-barred at the time of that transfer. As applied to this case, such a rule would preclude Tolle's recovery on either an insolvency theory or an actual intent theory *if* the Fenleys had established that Tolle's 1973 claim was time-barred by 2001.

¶ 52 The relevant questions in this case then become whether Tolle's claim was time-barred at the time of Father's 2001 transfers, and what, if any, effect the 2004 judgment had on Tolle's status as a creditor in 2001.

## III. Tolle's 1973 Claim Potentially Time–Barred by 2001

¶ 53 When Tolle's claims against Father arose in 1973, Florida's statute of limitations for torts appears to have been four years. *See Lindabury v. Lindabury,* 552 So.2d 1117, 1117–18 (Fla.Dist.Ct.App.1989). Assuming tolling for minority, Tolle's claim would have become time-barred in 1980, four years after she reached majority in 1976. More recently, Florida amended its statute to allow abuse victims to sue up to four years after either leaving the abuser's custody or discovering the injury, or seven years after reaching the age of majority. *See* Fla. Stat. § 95.11(7) (2005). If this statute were to be applied, Tolle's claim would have become time-barred in 1983.

¶ 54 Tolle's argument that the statute of limitations was tolled by Father's absence from Florida misstates Florida law and may not be supported by the evidence presented in this case. Tolle correctly asserts that the limitations period is tolled by the "[a]bsence from the state of the person to be sued." *Id.* § 95.051(1)(a) (2005). However, she neglects to point out that this tolling "shall not apply if service of process or service by publication can be made in a manner sufficient to confer jurisdiction to grant the relief sought." *Id.* § 95.051.

¶ 55 The limited evidence in the record bearing on this issue suggests that Father

may have been amenable to service,[7] and adequate service would seemingly subject Father to Florida jurisdiction for torts committed entirely within the state of Florida. And Tolle, as the person seeking to avoid the statute of limitations, would have the burden of establishing the contrary. *See Landers v. Milton,* 370 So.2d 368, 370 (Fla.1979) ("[T]he party seeking to escape the statute of limitations must bear the burden of proving circumstances that would toll the statute."); *see also Tracey v. Blood,* 78 Utah 385, 3 P.2d 263, 266 (1931) ("Apparently all courts are agreed, and in this case it is conceded that the burden was upon the plaintiff to plead and prove facts sufficient to toll the statute of limitations[.]").

¶ 56 Of course, none of this was litigated below and I will not speculate as to whether or when Tolle's 1973 claims actually would have become time-barred under applicable Florida law. It suffices for my purposes to establish that the statute of limitations question has not been definitively answered in favor of either Tolle or the Fenleys, and that the statute of limitations question, properly presented, may have been determinative of this suit.

## IV. Tolle's 2004 Judgment Did Not Create a Claim or Creditor Status as of 2001

¶ 57 Tolle's Florida default judgment was clearly a "right to payment" against Father as of its issuance, and as such, it supports Tolle's creditor status after September 2004. It is extremely problematic to suggest, however, that the 2004 judgment might somehow posthumously revive Tolle's 1973 claim for purposes of analyzing Father's 2001 transfer, if indeed it were to be established that the 1973 claim was time-barred by 2001. I do not believe that the majority opinion makes such a suggestion, but I think that reasonably creative attorneys could argue for this result, particularly under the fraudulent intent theory found in section 25–6–5(1)(a) and relied upon by the trial court below. *See* Utah Code Ann. § 25–6–5(1)(a).

¶ 58 Cases addressing the issue of posthumous claim revival in this context are understandably rare, as they require the convergence of both the entry of a judgment on a time-barred claim and a contested transfer occurring after the time bar but before the entry of the judgment. A handful of older cases, however, address the issue with great clarity. For example, in *Harper v. Raisin Fert. Co.,* the Alabama Supreme Court stated that:

> [T]he bill is by a creditor, to set aside a conveyance claimed to be fraudulent, and if, at the time the conveyance was made, the statute [of limitations] had barred the debt, *so that the debtor was at liberty to disregard the debt and convey the property,* the conveyance was not fraudulent. Hence a bill seeking to set it aside is without equity.

158 Ala. 329, 48 So. 589, 592 (1909) (emphasis added).

¶ 59 The most complete analysis of the issue of revival of creditor status by subsequent judgment comes from the Texas Supreme Court's 1882 *Hodges v. Taylor* decision, addressing a conveyance allegedly made to thwart collection on a note. 57 Tex. 196, 197–98 (1882). Despite its length, I provide the court's revival analysis in its entirety:

> The authorities are that a creditor, who seeks to set aside a conveyance of his debtor as fraudulent, must have a claim which can be enforced. If his claim be barred by limitation, he is not a creditor who can enforce his demand, and therefore is not one who can successfully assail as fraudulent a conveyance made by his former debtor. *Yet should he sue on this claim, and the debtor fail to plead limitation, he may obtain a judgment unquestionably valid as between him and the debtor.* So if, the claim being barred, the debtor sees fit to revive it by a written acknowledgment of its justice and a written promise to pay it, the debt becomes once more valid as between the creditor and debtor. In each case it is the assent

---

7. While Tolle testified that she could not locate Father throughout the years, she also testified that she did locate him shortly after inquiring as to his whereabouts with relatives. Mary Fenley testified that Father's relatives had lived in Ohio for 200 years and that "everybody knew where he was."

or acquiescence of the former debtor which results in a claim capable of enforcement. In the latter case that assent is express— in the former it is implied. *Before the claim was revived the alleged fraudulent conveyance was binding as between the grantor and grantee,* and the title of the grantee was good, not only as against the grantor, but as against this former creditor of the grantor. *That title being thus complete as against them, it is not believed that it could be affected or impaired by any transaction between them to which the grantee is not a party. The true date of the indebtedness is the new promise, or the judgment, and these being subsequent to the conveyance, the creditor, under the rule prevailing in this state, is not ordinarily one who can impeach that conveyance.*

After the discharge of [note maker Thomas] Evans, [note holder D.M.] Sanderlin could only enforce his claim against him by the assent of Evans, and in our opinion the court rightly held that Sanderlin could only claim the rights of a creditor for the purpose of impeaching the deed to Charles I. Evans "as of the date of the judgment."

*Id.* at 199 (emphasis added) (citations omitted); *see also Lopez's Heirs v. Bergel,* 12 La. 197, 201 (1838) (stating that "if, at a time when Gregorio Bergel was under no legal obligation to pay the note recited in the judgment, he conveyed to the defendant, the plaintiffs have no right to question the sale" even though Bergel subsequently reaffirmed the time-barred note).

¶ 60 I find these cases to be on point and persuasive despite their age. Adopting their analysis, I would determine that *if* Tolle's 1973 claim was time-barred in 2001, then Tolle was not a creditor of Father as of that date and Father was "at liberty to disregard the debt and convey the property." *Harper,* 48 So. 589 at 592. Under such circumstances, the title that Mary Fenley received in 2001 would be "good, not only as against

[Father], but as against [Tolle,] th[e] former creditor of [Father]." *Hodges,* 57 Tex. at 199. And, the "true date of [Father's] indebtedness" to Tolle as it relates to a UFTA claim would be the "date of the judgment." *Id.* (quotations omitted).

## V. No UFTA Relief if Tolle's 1973 Claim Was Time–Barred by 2001

¶ 61 If Tolle's 1973 claim was time-barred by 2001 and her 2004 judgment is treated as a new and independent debt for UFTA purposes, Father's 2001 transfer to Fenley could not be deemed fraudulent under UFTA. The insolvency theory relied upon by the trial court and the majority opinion would be unavailable, as UFTA's insolvency theory can be invoked only by a "creditor whose claim arose before the transfer." Utah Code Ann. § 25–6–6(1)(a). Tolle's "claim" would be her 2004 judgment, which despite its nexus to the 1973 claim is only a right to payment as of the date of its issuance. *See Hodges,* 57 Tex. at 199 ("The true date of the indebtedness would be the . . . judgment[.]").

¶ 62 The same legal framework could also preclude any finding that the 2001 transfers violated UFTA's intent theory. *See* Utah Code Ann. § 25–6–5(1)(a). If Tolle's 1973 claim was time-barred in 2001, she had no right to payment on the claim at the time of the transfers. Thus, Father's intent to protect his assets from Tolle's threatened litigation on the 1973 cause of action [8] could not implicate UFTA because the alleged debt that Father intended to hinder, delay, or defraud was no longer legally enforceable and was therefore no longer a claim under UFTA. *See id.* § 25–6–2(3) (defining a claim as "a right to payment"). Accordingly, Tolle's time-barred 1973 claim would be irrelevant to the UFTA intent analysis. *Cf. Hullett v. Cousin,* 204 Ariz. 292, 63 P.3d 1029, 1030 (2003) (determining that a claim "must be disregarded [for UFTA purposes] if found to be time-barred at the time of the transfer"); *Hodges,* 57 Tex. at 199 ("The true date

---

**8.** I do not disagree with either the trial court or the majority opinion in their analyses of Father's intent. The circumstances of Father's transfers bear many of the hallmarks of actual intent to defraud a creditor. *See* Utah Code Ann. § 25–6– 5(2). Nevertheless, Father's potentially mistaken belief Tolle was a creditor cannot convert her into a UFTA creditor if she did not actually have a "right to payment" from Father at the time of the intended fraud.

of the indebtedness would be the ... judgment[.]").

¶ 63 Similarly, even if Father's intent had been to avoid payment on Tolle's subsequent 2004 judgment instead of the 1973 claim, the transfers would still not have been fraudulent on an intent theory because Tolle was not a creditor at the time of the transfers. *See* Utah Code Ann. § 25–6–5 (allowing a grantor's intent to defraud an existing creditor to establish fraud without regard to whether the UFTA plaintiff's claim arises before or after a transfer). Additionally, there is no support in the record to suggest Father's intent to defeat some future default judgment. The trial court found that Father intended to defeat Tolle's "claim," which the court had just determined to mean her threats of litigation over his 1973 actions. Tolle's 2004 default judgment was not foreseeable at the time of the transfers, and the judgment would never have occurred at all if Father had lived to answer Tolle's Florida complaint and had successfully asserted a statute of limitations defense.[9]

¶ 64 For these reasons, I do not view Tolle's 2004 default judgment as reviving her 1973 claim as of 2001, or otherwise influencing a UFTA analysis of the 2001 transfers.

## VI. The Fenleys Did Not Preserve the Statute of Limitations Issue

¶ 65 Notwithstanding the entire analysis above, I concur in the result reached by the majority opinion because I cannot see how the Fenleys preserved these arguments below.

¶ 66 The Fenleys, acting pro se, stated in their answer that "Defendants question why there is no date to be found anywhere on [the Florida complaint].... [T]he Defendants feel that the date has been purposely withheld or obliterated to conceal the utter untimeliness of its submission." The Fenleys also asserted that Father's whereabouts were well known to many of his family members and were not being kept secret. They did not specifically assert a statute of limitations defense, although their co-defendants stated in their answer that Tolle's claims were "barred by the applicable statutes of limitation in Florida and or Ohio." The Fenleys' answer contained a general request for summary judgment, which Tolle never responded to and the trial court never ruled on or addressed. And Tolle's Utah complaint also showed facts on its face indicating that her Florida claim may have been time-barred at the time of Father's transfer.

¶ 67 The Fenleys presented no more pretrial pleadings. A bench trial was held without opening statements on October 7, 2004. Tolle, the Fenleys, and three other defendants below were the only witnesses. Tolle admitted on cross-examination that her Florida judgment had been obtained after Father's estate failed to appear and defend that action, i.e., it was at least a de facto default judgment.[10] Mary Fenley testified that Father had had family in Ohio for 200 years and that "everybody knew where he was." I can find no other testimony from the bench trial bearing on the 2001 status of the 1973 claim.

9. *Hodges v. Taylor* provides an additional analysis that I believe is germane to this issue:

There is another course of reasoning which leads to the same result. The ground on which the creditor is allowed to impeach a fraudulent conveyance is that it is a fraud upon his legal rights. But where the creditor's claim only becomes enforceable by the assent of the debtor, it would seem unreasonable to construe that assent as empowering the creditor to attack the debtor's conveyance as fraudulent. The revival of a barred debt, or the failure to plead a discharge in bankruptcy, could neither of them have been intended to assent to such an attack. The very fact that it is only by the debtor's assent that the claim is valid and enforceable goes far to negative any right, growing out of that assent, to make the charge

of fraud, actual or constructive. The creditor only gets into court by virtue of the debtor's assent, and that being so, his charge of fraud against his debtor seems hardly admissible. 57 Tex. 196, 199–200 (1882). Father's estate waived any Florida statute of limitations defense on his behalf by failing to raise it. If Tolle's claim was in fact time-barred, I would conclude that the estate's waiver was the equivalent of Father's affirmative assent to, or renewal of, Tolle's claim.

10. Although the Florida judgment was admitted as an exhibit at trial, it does not appear in the record on appeal. Tolle's pleadings are vague about the nature of the judgment, referring only to her 1973 claim "result[ing]" in a judgment.

¶ 68 The court did not hear closing arguments at the trial, instead allowing the parties to submit proposed findings and conclusions stating their interpretation of the *proper* results. The Fenleys' submission did not include any findings or conclusions pertaining to the 1973 claim being time-barred in 2001, stating merely that the "facts presented cast a doubt on Jeanne Tolles [sic] status as a creditor according to Utah state code § 25–6–2" and requesting that the court uphold the transfers "[e]ven if the court determines that Jeanne Tolle was in fact a creditor."

¶ 69 The general issue of whether Tolle was Father's creditor at the time of the 2001 transfers was clearly preserved, as the trial court conducted a substantial analysis on this issue. However, the Fenleys made no effort to educate the trial court about the appropriate Florida statute of limitations or clarify that they were invoking it to defeat Tolle's 2001 creditor status rather than to attack the Florida judgment itself. Without testimony or argument on the issue, the trial court had no reason to decide whether Tolle's 1973 claim might have been time-barred in 2001, or whether such a time bar might destroy Tolle's 2001 creditor status.

¶ 70 Doubtless the shortcomings in the Fenleys' prosecution of their case resulted in large part from their pro se status. However, even though this court "generally is lenient with pro se litigants" and is "understandably loath to sanction them for a procedural misstep here or there," we cannot advocate on their behalf or ignore the requirements necessary to preserve an issue for appeal. *Lundahl v. Quinn,* 2003 UT 11, ¶ 4, 67 P.3d 1000. Rather, " 'as a general rule, a party who represents himself will be held to the same standard of knowledge and practice as any qualified member of the bar.' " *Id.* at ¶ 3 (quoting *Nelson v. Jacob-*

*sen,* 669 P.2d 1207, 1213 (Utah 1983)). "[I]f a litigant, for whatever reason, sees fit to rely on himself as counsel, he must be prepared to accept the consequences of his mistakes and errors." *Nelson,* 669 P.2d at 1220 (Hall, C.J., concurring and dissenting) (emphasis omitted).

¶ 71 While a layperson acting as his or her own attorney "should be accorded every consideration that may reasonably be indulged," *Lundahl,* 2003 UT 11 at ¶ 3, 67 P.3d 1000, I do not consider ignoring the Fenleys' complete failure to address these arguments below to be a reasonable accommodation to their pro se status. The Fenleys did not adequately bring their concerns before the trial court, and thus I cannot find error in the court's ruling given the facts and law that were presented. The Fenleys have not argued either plain error or exceptional circumstances on appeal, and I therefore would not address their unpreserved argument.

## VII. Conclusion

¶ 72 In conclusion, I believe that the majority opinion, as well as the trial court, employed an analysis that is inconsistent with existing caselaw applying UFTA and other fraudulent conveyance statutes. While I do not believe the Fenleys preserved the statute of limitations issue, I do not think that this court should allow the Fenleys' shortcomings below to result in binding precedent establishing what I believe to be either incorrect or ill-advised law. Accordingly, I concur only in the result reached by the majority.